David S. Gingras, #021097
**Gingras Law Office, PLLC**
3941 E. Chandler Blvd., #106-243
Phoenix, AZ 85048
Tel.: (480) 668-3623
Fax: (480) 248-3196
David@GingrasLaw.com

Attorney for Plaintiff Xcentric Ventures, LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

XCENTRIC VENTURES, LLC, an
Arizona limited liability company,

   Plaintiff,

v.

LISA JEAN BORODKIN and JOHN DOE
BORODKIN, husband and wife;
RAYMOND MOBREZ and ILIANA
LLANERAS, husband and wife;
DANIEL BLACKERT and JANE DOE
BLACKERT, husband and wife;
ASIA ECONOMIC INSTITUTE, LLC, a
California limited liability company;
DOES 1-10, inclusive,

   Defendants.

Case No: _____

**VERIFIED COMPLAINT**

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

For its Verified Complaint Plaintiff XCENTRIC VENTURES, LLC alleges as follows:

  1.  This is an action to recover damages arising from a frivolous lawsuit maliciously and wrongfully commenced and continued by Defendants against Plaintiff in the State of California ("the Asia Litigation").

  2.  In preparation for and during the course of the Asia Litigation, Defendants engaged in a wide variety of unlawful, criminal, tortious, and unethical conduct including, but not limited to: **perjury** in violation of 18 U.S.C. § 1621, **subornation of perjury** in violation of 18 U.S.C. § 1622, **false swearing** in violation of 18 U.S.C. § 1623, and multiple/repeated violations of the California Rules of Professional Conduct including, but not limited to: Rule 3-200 (prohibiting a lawyer from bringing an action or asserting any position in litigation without probable cause and for the purpose of

1    harassing or maliciously injuring any person); Rule 3-210 (prohibiting a lawyer from

2    advising a client to violate the law); and Rule 5-200(B) (prohibiting a lawyer from

3    misleading a court by making a false statement of fact).

4                                              **PARTIES**

5        3.      Plaintiff XCENTRIC VENTURES, LLC ("Xcentric") is an Arizona limited

6    liability company which operates, and at all relevant times has operated, the website

7    www.RipoffReport.com ("Ripoff Report").

8        4.      Defendant LISA JEAN BORODKIN ("BORODKIN") is an attorney

9    licensed to practice law in the States of California and New York.  At all times relevant to

10   this action, Defendant BORODKIN was married to JOHN DOE BORODKIN and was

11   acting on behalf of, and for the benefit of, their marital community.

12       5.      Defendants RAYMOND MOBREZ ("MOBREZ") and ILIANA

13   LLANERAS ("LLANERAS") are, and at all relevant times were, a married couple

14   residing in Los Angeles, California.

15       6.      At all times relevant to this action, MOBREZ and LLANERAS were the

16   principals of Defendant ASIA ECONOMIC INSTITUTE, LLC ("AEI") which is a

17   California limited liability with its principal place of business in Los Angeles, California.

18       7.      Defendant DANIEL BLACKERT ("BLACKERT") is an attorney licensed

19   to practice law in the States of California.  At all times relevant to this action, Defendant

20   BLACKERT was married to JANE DOE BLACKERT and was acting on behalf of, and

21   for the benefit of, their marital community.

22       8.      DOES 1–10 are individuals and/or entities, the true names of which are not

23   currently known, who are or who may be liable to Xcentric for the conduct alleged

24   herein.

25                                       **JURISDICTION/VENUE**

26       9.      Defendants, and each of them, have knowingly, intentionally and

27   deliberately engaged in tortious activity directed at and within the State of Arizona and

28   intentionally directed at Xcentric and Xcentric's principals, officers, agents and

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

2

**VERIFIED COMPLAINT**

1  employees including non-party EDWARD MAGEDSON ("Magedson") who are

2  residents of the State of Arizona.  As more specifically alleged herein, Defendants'

3  actions were specifically intended to cause harm to Plaintiff within the State of Arizona

4  and, in fact, Defendants' actions had the intended effect of actually causing substantial

5  harm to Plaintiff within the State of Arizona.  Defendants, and each of them, are therefore

6  properly subject to personal jurisdiction within the State of Arizona.

7       10.  Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction

8  because there is complete diversity among the parties and the amount in controversy

9  exceeds $75,000.00.

10       11.  Pursuant to 28 U.S.C. § 1391(a)(2), venue is proper in this judicial district

11  because a substantial part of the events giving rise to Plaintiff's claims occurred in this

12  district.

13  <div align="center">**ALLEGATIONS COMMON TO ALL CLAIMS**</div>

14       12.  The Ripoff Report is, among other things, a website for consumer

15  complaints.  Any member of the public with access to a computer and an Internet

16  connection may use the Ripoff Report website to create and publish complaints about

17  companies or individuals who they believe have wronged them in some manner.

18       13.  Complaints published on the Ripoff Report are automatically indexed by

19  numerous search engines such as Google and such complaints often rank very high in

20  Google's search results.  Because of this high ranking, individuals or businesses with

21  complaints on the Ripoff Report website may be negatively impacted.

22       14.  Since the site began in 1998, because of the negative impact that

23  complaints on the Ripoff Report website may have, Xcentric has been sued numerous

24  times by plaintiffs seeking to remove reports or otherwise obtain damages from Xcentric

25  for the publication of such reports.

26       15.  As a matter of law and pursuant to the Communications Decency Act, 47

27  U.S.C. § 230(c)(1) (the "CDA"), except as to certain types of intellectual property claims

28  and criminal claims, Xcentric is generally immune from any civil cause of action arising

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

<div align="center">3</div>

<div align="center">**VERIFIED COMPLAINT**</div>

from material posted on the Ripoff Report site by a third party.  As a result of the CDA, because Xcentric normally plays no material role in the creation of the reports at issue, lawsuits seeking to force the removal of reports through litigation have frequently been dismissed or otherwise resolved in favor of Xcentric.

16.     In addition to frequent praise and nearly unanimous judicial affirmation, the CDA has also drawn substantial and widespread commentary and passionate criticism from those who disagree with or dislike the law or the results which it sometimes requires.

17.     Among those who have been targeted by online criticism on the Ripoff Report website or elsewhere, the CDA is often seen as an unfair law which creates an improper "loophole" allowing sites such as the Ripoff Report to publish derogatory and even defamatory speech with complete impunity.

18.     One well-known commentary regarding both the CDA and the Ripoff Report website is an article written by an attorney, Sarah Bird, entitled "The Anatomy of a RipOff Report Lawsuit" which was originally published on January 21, 2008 on www.SEOmoz.org (the "Bird Article").   The Bird Article purports to offer a legal analysis of the Ripoff Report's successful litigation history, as well as the author's opinions regarding the CDA and her answers to the following questions, among others: **"Is it true that RipOff Report has never lost a lawsuit? Is this a failure of the legal system? Are the allegations unfounded? If there is truth in the allegations, then how is the system going wrong? Why can't RipOff Report be held responsible for its conduct?"**

19.     Among other things, the Bird Article contains a discussion of federal racketeering laws, specifically the Racketeer Influenced and Corrupt Organizations Act or "RICO", codified at 18 U.S.C. §§ 1961, *et seq*., and the predicate act of extortion. Among other things, the Bird Article suggests that plaintiffs seeking to avoid the limitations imposed by the CDA may be able to do so by pursing federal RICO claims against Xcentric predicated upon alleged acts of extortion.

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

**VERIFIED COMPLAINT**

20.     In closing, the author of the Bird Article specifically encouraged litigants to attempt to overcome Xcentric's CDA immunity by bringing claims of RICO/extortion: "I hope that plaintiffs will continue to press the RICO/Extortion combo … ."

21.     On January 28, 2009, a third party posted a complaint on the Ripoff Report website concerning AEI, MOBREZ, and LLANERAS.  The report was written from the perspective of an unhappy former employee and it contained various derogatory statements about AEI, MOBREZ, and LLANERAS.   Other similar reports were subsequently posted on the site by third parties between early 2009 and early 2010.

22.     Based on the publication of these reports, Defendants MOBREZ and LLANERAS decided to commence litigation against XCENTRIC and Magedson.

23.     Prior to the commencement of the Asia Litigation, Defendants MOBREZ and/or LLANERAS and/or BLACKERT and/or Does 1-10 performed legal research and requested that unknown others perform research, on previous lawsuits involving XCENTRIC.  During the course of this research, Defendants MOBREZ, LLANERAS, and BLACKERT reviewed the Bird Article, among other things, and determined that based on the CDA, litigation against XCENTRIC and Magedson was extremely unlikely to succeed, assuming the litigation merely accused XCENTRIC and/or Magedson of publishing material submitted to the Ripoff Report website by a third party.

24.     Based on this conclusion, Defendants MOBREZ, LLANERAS, and BLACKERT determined that an alternative litigation strategy was necessary such as the RICO/extortion theory advocated in the Bird Article.  However, Defendants MOBREZ, LLANERAS, and BLACKERT knew that they could not legitimately present such a theory because at no time was AEI actually extorted by XCENTRIC or Magedson.

25.     To solve this problem, at some time in or around April 2009, Defendants MOBREZ and LLANERAS devised a plan, to wit: Defendant MOBREZ would contact Magedson by telephone and would attempt to induce Magedson to ask for money in exchange for the removal of the reports about AEI thereby permitting AEI to proceed with litigation under a RICO/extortion theory.

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

**VERIFIED COMPLAINT**

26.    In furtherance of this plan, in April and May 2009 MOBREZ placed a series of seven telephone calls to Magedson using the primary phone number listed on the Ripoff Report website; (602) 359-4357.  The date, time, and duration of each call from MOBREZ to Magedson is reflected in the table below:

| TABLE OF CALLS | | | | |
|---|---|---|---|---|
| Call # | Date | Start Time | Call From # | Length Min |
| 1 | 4/27/2009 | 3:21 PM | (310) 806-3000 | 3.5 |
| 2 | 4/27/2009 | 3:27 PM | (310) 806-3000 | 1.0 |
| 3 | 4/27/2009 | 3:28 PM | (310) 806-3000 | 2.9 |
| 4 | 5/5/2009 | 11:28 AM | (310) 806-3000 | 2.6 |
| 5 | 5/5/2009 | 1:05 PM | (310) 806-3000 | 2.2 |
| 6 | 5/9/2009 | 1:10 PM | (310) 801-5161 | .5 |
| 7 | 5/12/2009 | 2:46 PM | (310) 806-3000 | 16.5 |

27.    Defendant LLANERAS was secretly listening to calls #4, 5 and 7 from Defendant MOBREZ to Magedson without Magedson's knowledge.

28.    Following the completion of the calls and on the last day prior to the expiration of the statute of limitations as to the first report about AEI, on January 27, 2010 Defendants AEI, MOBREZ, LLANERAS, and BLACKERT commenced the Asia Litigation which began in the Los Angeles County Superior Court, Case No. SC106603. The action was subsequently removed to the United States District Court, Central District of California, Case No. 2:10-cv-01360-SVW–PJW.

29.    A true and correct copy of the original 33-page Complaint filed in the Asia Litigation, excluding exhibits, is attached hereto as **Exhibit A**.

30.    In their initial Complaint AEI, MOBREZ, and LLANERAS asserted twelve claims for relief against XCENTRIC and Magedson including two federal RICO causes of action, one predicated on "extortion" and one predicated on "wire fraud".  The Complaint accused XCENTRIC and Magedson of engaging in a "SHAKEDOWN" by, among other things, "offer[ing] to enroll Plaintiffs in the CAP program for a fee of at least five thousand dollars ($5,000), plus a monthly monitoring fee."

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

**VERIFIED COMPLAINT**

31.     At a hearing which took place on April 19, 2010, Defendant BORODKIN entered an appearance in the Asia Litigation as counsel for AEI, MOBREZ, and LLANERAS.   From April 19, 2010 through the final conclusion of the case, Defendant BORODKIN was actively involved in the Asia Litigation as counsel for MOBREZ, LLANERAS, and AEI.

32.     At the conclusion of the hearing, the District Court issued an order, a true and correct copy of which is attached hereto as **Exhibit B**.  In the April 19th order, the Court required "plaintiff" (meaning AEI, MOBREZ, and LLANERAS) to "file a declaration describing meetings with any representative of defendant regarding extortion[]" and to do so within two weeks.

33.     On the last day to do so, May 3, 2010, MOBREZ and LLANERAS filed their declarations with the Court as ordered.  True and correct copies of their declarations are attached hereto as **Exhibits C** and **D**, respectively.  Both declarations were sworn to as true and correct under penalty of perjury pursuant to 28 U.S.C. § 1746.

34.     In his declaration, Defendant MOBREZ detailed the alleged contents of his telephone calls to Magedson in April and May 2009.  In Paragraph 10 of his declaration, Defendant MOBREZ described the contents of one such conversation with Magedson as follows:

> On May 5, 2009, I again contacted the Ripoff Report office by phone. I asked the man, who now identified himself as Ed Magedson, if he had received the e-mail I sent to him February 28, 2009. Mr. Magedson responded that I would need to enroll in the CAP program. Again, I asked for more information regarding the program, including the cost of participation. Mr. Magedson proceeded to describe his Web site and how it could benefit us.  He then emphasized that his Web site has immunity under the law and, therefore could not be sued.  Moreover, he claimed to have a team of lawyers that would fight us if we chose to sue him.  He further warned that others had tried but failed and that it was best to just "go with the program."   Ms. Llaneras witnessed this conversation from her office phone.

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

7

**VERIFIED COMPLAINT**

35.     In Paragraph 13 of his declaration, Defendant MOBREZ described the contents of a second conversation with Mr. Magedson as follows:

> Later that day, I responded to Mr. Magedson's e-mail by phone.  I told Mr. Magedson that I had received his e-mail and was still uncertain what he wanted me to do.  Mr. Magedson responded that I would have to go onto his Web site and enroll in the CAP program.  When asked what it would cost for us to participate in his program, Mr. Magedson replied that it would cost us at least "five grand" plus a monthly maintenance fee of a couple hundred dollars.  He stated that these charges were based on the size if [sic] company.  Specifically, he stated that the more money a company made, the more they would be charged.  When asked the reasoning behind this, he was not responsive.  He again instructed me to fill out the CAP forms.  Again, Ms. Llaneras listened from her office phone.

36.     Among other allegations, the allegation that Mr. Magedson demanded "at least 'five grand'" from Defendant MOBREZ formed the primary basis for the claim that XCENTRIC and Magedson engaged in extortion as to AEI, MOBREZ, and LLANERAS.

37.     In her May 3, 2010 declaration, Defendant LLANERAS testified under penalty of perjury that "I witnessed the conversations that took place between Mr. Mobrez and Mr. Magedson on May 5th and 12th, 2009.  Specifically, I listened in on the conversation from my office phone."

38.     In her declaration, Defendant LLANERAS further testified under penalty of perjury that "Mr. Mobrez's Declaration is a true and accurate rendition of the conversations that I witnessed between Mr. Mobrez and Mr. Magedson."

39.     In her declaration, Defendant LLANERAS further testified under penalty of perjury that she took handwritten notes during each conversation between Defendant MOBREZ and Magedson as the conversations occurred.

40.     On Friday, May 7, 2010, Defendant MOBREZ was deposed in Los Angeles, California regarding his allegations in the Asia Litigation.  During his deposition, Defendant MOBREZ reviewed his May 3, 2010 declaration and reaffirmed, again under penalty of perjury, that the statements contained in his declaration were truthful and accurate.

**VERIFIED COMPLAINT**

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

41.     Unbeknownst to Defendants MOBREZ and LLANERAS, all of Defendant MOBREZ's calls to the Ripoff Report website were automatically recorded by Xcentric's phone system.  This fact was disclosed to Defendants MOBREZ and LLANERAS for the first time near the end of MOBREZ's deposition on May 7.

42.     As reflected in the recordings of the conversations between Defendant MOBREZ and Magedson, Defendants MOBREZ and LLANERAS each committed perjury when they testified that Magedson demanded $5,000 from MOBREZ in a telephone conversation on May 5, 2009.  This allegation was, and is, completely false.

43.     In truth, at no time during any telephone conversion or at any other time did Magedson ever ask for any money from Defendants MOBREZ or LLANERAS. Defendants MOBREZ and LLANERAS fabricated this allegation in an effort to create causes of action against XCENTRIC and Magedson which they believed would be sufficient to avoid CDA immunity.  By doing so, Defendants MOBREZ and LLANERAS hoped to force the removal of the reports about AEI, MOBREZ and LLANERAS on the Ripoff Report website.

44.     On May 11, 2010, a letter was sent to Defendants BORODKIN and BLACKERT, a true and correct copy of which is attached hereto as **Exhibit E**.  Among other things, this letter reiterated that Defendant MOBREZ and LLANERAS had committed perjury and that their claims against XCENTRIC and Magedson were completely groundless.

45.     In addition, the May 11, 2010 letter reminded Defendants BORODKIN and BLACKERT that Rule 3–700 of the California Rules of Professional Conduct required the mandatory withdrawal of any attorney who: "knows or should know that the client is bringing an action, conducting a defense, asserting a position in litigation, or taking an appeal, without probable cause and for the purpose of harassing or maliciously injuring any person … ."

46.     In addition, the May 11, 2010 letter cautioned Defendants BORODKIN and BLACKERT that: "Xcentric has successfully sued parties and their lawyers for

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

9
**VERIFIED COMPLAINT**

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

knowingly commencing and continuing litigation that they knew was factually groundless.  Xcentric intends to bring such claims against your clients for their wrongful actions and we will not hesitate to include claims against either or both of you individually if you continue to prosecute any claims in this case which you know are factually untrue or if the evidence demonstrates that you brought this case knowing that the allegations contained in it were factually untrue."

47.     The May 11, 2010 letter to Defendants BORODKIN and BLACKERT concluded with the following admonition: "In closing, I want to emphasize one obvious fact—your clients have lied about the material facts of this case.  As such, just as your clients were, you now stand at a crossroads wherein you have a choice: you can do the right thing and follow the requirements set forth by the law and by your ethical duties, or your can ignore those duties and face the consequences."

48.     Following receipt of the May 11, 2010 letter, Defendants BORODKIN and BLACKERT did not withdraw from the Asia Litigation.  Instead, despite knowing that the claims made by their clients were factually untrue, they continued to pursue the case even more aggressively than before.

49.     On May 20, 2010, Defendants MOBREZ and LLANERAS filed "Corrected" declarations with the court, true and correct copies of which are attached hereto as **Exhibits F** and **G**, respectively.  In her "corrected declaration", Defendant LLANERAS substantially recanted all of her prior testimony regarding the extortion allegedly committed by XCENTRIC and Magedson.

50.     In his "corrected declaration", Defendant MOBREZ also recanted substantial portions of his previous testimony regarding the alleged substance of his telephone conversations with Magedson in April and May 2009.  However, Defendant MOBREZ further perjured himself by testifying for the first time, "In addition, there were a number of incoming calls to me from Ripoff Report."  In truth, Defendant MOBREZ knew that at no time were any calls ever made from Ripoff Report to him. This allegation was simply another lie intended to further his fraud upon the Court.

**VERIFIED COMPLAINT**

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

51.     Upon information and belief, Defendants BORODKIN and BLACKERT assisted Defendant MOBREZ with the creation of his "corrected declaration" and in doing so BORODKIN and BLACKERT intentionally suborned perjury from MOBREZ.

52.     On May 24, 2010, XCENTRIC and Magedson filed a Motion for Summary Judgment in the Asia Litigation which argued that AEI, MOBREZ, and LLANERAS had engaged in a fraud upon the Court by lying as to their extortion claims.  The motion further argued that AEI could not prevail on certain of its other claims due to Defendant MOBREZ's deposition testimony in which he revealed that during nine years of existence, AEI's total revenues were $0.

53.     Defendants, and each of them, actively and aggressively opposed XCENTRIC's Motion for Summary Judgment despite knowing that each and every claim in the Asia Litigation was factually groundless and that the action was commenced wrongfully, maliciously and for the improper purpose of harassment and seeking relief to which Defendants were not entitled as a matter of law.

54.     In an effort to prolong the action and compound the harm caused, one day before XCENTRIC's Motion for Summary Judgment was set to be heard, on July 9, 2010 Defendant BORODKIN filed a pleading entitled, "*PLAINTIFFS' EX PARTE MOTION (1) UNDER RULE 56(f) TO DENY OR CONTINUE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT TO CONDUCT FURTHER DISCOVERY AND (2) COMPELLING DEFENDANT ED MAGEDSON TO APPEAR FOR DEPOSITION WITH DOCUMENTS AND (3) FOR SANCTIONS UNDER LOCAL CIVIL RULES 37-4 AND 83-7*."

55.     In her July 9 pleading, Defendant BORODKIN vigorously argued against the disposition of any of the claims against XCENTRIC and Magedson, claiming, "Defendants [XCENTRIC and Magedson] will do anything to avoid the August 3, 2010 trial date."  To support that position, Defendant BORODKIN accused XCENTRIC, Magedson, and their counsel of a variety of improper conduct including, but not limited to:

**VERIFIED COMPLAINT**

- "With escalating frequency, disobey and misrepresent this Court's Orders and Rules, and dictating procedural rules of their own making"

- "Harass Defendants' [sic] counsel with veiled threats of administrative proceedings and explicit threats of Rule 11 sanctions without basis."

56.     At the time she filed the July 9 pleading, Defendant BORODKIN knew that her allegations of improper conduct against XCENTRIC, Magedson, and their counsel were completely false.

57.     On July 19, 2010, the District Court in the Asia Litigation issued a 53-page order granting partial summary judgment in favor of XCENTRIC and Magedson as to the RICO/extortion claims and denying all relief requested in Defendant BORODKIN's July 9 pleading.  The court further dismissed the RICO/wire fraud claim pursuant to Fed. R. Civ. P. 9(b) but granted leave to amend.

58.     Despite knowing that the case was entirely groundless and frivolous, on July 27, 2010, Defendants, and each of them, prepared and filed an 84-page First Amended Complaint in the Asia Litigation supported by more than 250 pages of exhibits.

59.     Shortly thereafter, on August 16, 2010, Defendants BLACKERT and BORODKIN filed a Motion for Reconsideration requesting that the District Court reconsider its summary judgment ruling.  In support of this request, Defendants BORODKIN and MOBREZ each submitted lengthy declarations which purported to describe unlawful "threats" made by Magedson and his counsel during a settlement conference which took place on July 20, 2010.

60.     On September 27, 2010, XCENTRIC filed a Motion for Summary Judgment as to the First Amended Complaint in the Asia litigation.  At the time the motion was filed, the matter was set for hearing on November 1, 2010.

61.     Less than two hours before the November 1, 2010 summary judgment hearing and knowing that XCENTRIC's counsel would be traveling from Arizona to Los Angeles for the hearing, Defendant BORODKIN filed a *second* motion requesting relief under Rule 56(f).  Defendant BORODKIN supported her second Rule 56(f) motion with

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

12

**VERIFIED COMPLAINT**

a declaration in which she described, at length, her recent communications with an individual, JAMES ROGERS ("ROGERS") who was previously employed as a personal assistant to Magedson.  Defendant BORODKIN further declared that a Rule 56(f) continuance was needed due to her inability to obtain ROGERS' deposition prior to the November 1, 2010 summary judgment hearing.

62.    In her declaration, Defendant BORODKIN made knowingly false and misleading statements to the court regarding the circumstances of ROGERS' deposition.  Specifically, Defendant BORODKIN declared:

> On or about October 22, 2010, I received a telephone call from Defendants' attorney David Gingras. We again spoke about the possibility of avoiding this motion – but his proposal – that I fly to Phoenix the next day, Saturday, October 23, 2010 to do a joint deposition of Mr. Rogers, did not seem feasible. Plaintiffs had already purchased an airline ticket for Mr. Rogers for October 23, 2010.

63.    Defendant BORODKIN's declaration was false and intentionally misleading insofar as she implied that the only option she was given for taking the deposition of ROGERS to "fly to Phoenix the next day … ."  In truth, on October 22, 2010 Defendant BORODKIN received an email from XCENTRIC's counsel which offered "to allow you to take the deposition of James Rogers immediately at any time prior to Nov. 1st and at any place … ."  Defendant BORODKIN intentionally sought to mislead the Court at to this issue in the hopes that doing so would permit her to further harm XCENTRIC and Magedson by prolonging the Asia Litigation.

64.    On November 1, 2010 after XCENTRIC's counsel had arrived in Los Angeles from Arizona, the District Court vacated the hearing on XCENTRIC's second Motion for Summary Judgment.  The hearing was vacated solely due to the last minute filing of Defendant BORODKIN's second Rule 56(f) motion.

65.    On May 4, 2011, the District Court issued an order denying Defendant BORODKIN's second Rule 56(f) motion in its entirety and granting summary judgment in favor of XCENTRIC and Magedson as to all claims in the Asia Litigation.  In a

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

13

**VERIFIED COMPLAINT**

1  footnote to its order, on the issue of Defendant BORODKIN's second Rule 56(f) motion,

2  the District Court noted:

> The Court notes that this eleventh hour filing was consistent with
> Plaintiffs' pattern in this case. On Friday, July 9, 2010, one day before to
> the previous summary judgment hearing in this case, Plaintiffs also filed an
> Ex Parte Application to deny or continue Defendants' motion for summary
> judgment so as to allow Plaintiffs to conduct further discovery under
> Federal Rule of Civil Procedure 56(f). [Docket no. 87]. That ex parte
> application was denied in the Court's July [Docket no. 94]. Plaintiffs have
> demonstrated a pattern of filing papers late in this case and generally
> disregarding the scheduling orders of the Court.

66.    By virtue of the May 4, 2011 summary judgment order, the Asia Litigation
was resolved in favor of XCENTRIC and Magedson and against AEI, MOBREZ and
LLANERAS with respect to all claims and all relief requested.

67.    On June 15, 2011, a final judgment was entered in the Asia Litigation, a
copy of which is attached hereto as **Exhibit H**.  The final judgment resolved the Asia
Litigation in favor of XCENTRIC and Magedson and against AEI, MOBREZ and
LLANERAS with respect to all claims and all relief requested.

## **FIRST CAUSE OF ACTION**

## **WRONGFUL INITIATION OF CIVIL PROCEEDINGS**

### **(Against AEI, MOBREZ, LLANERAS and BLACKERT)**

68.    Xcentric incorporates the above allegations as if fully set forth herein.

69.    At the time the Asia Litigation was commenced, Defendants AEI,
MOBREZ, LLANERAS and BLACKERT each knew the action was factually groundless
as to each and every claim.

70.    At the time the Asia Litigation was commenced, Defendants AEI,
MOBREZ, LLANERAS and BLACKERT each knew the action was factually groundless
in particular as to the allegations of RICO/extortion and RICO/wire fraud.

71.    Defendants AEI, MOBREZ, LLANERAS and BLACKERT commenced
the Asia Litigation without probable cause.

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

**VERIFIED COMPLAINT**

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

72.     Defendants AEI, MOBREZ, LLANERAS and BLACKERT commenced the Asia Litigation solely for improper purposes.   Specifically, the action was commenced solely for non-legitimate reasons including, but not limited to, the following:

a.    To pressure Xcentric to remove material from the Ripoff Report website, without any legal basis for doing so, rather than incurring significant legal fees defending a frivolous case;

b.    To discourage XCENTRIC from allowing consumers to post complaints about MOBREZ, LLANERAS, AEI on the Ripoff Report website in the future;

c.    To create the false impression that MOBREZ, LLANERAS, AEI were "victims" of extortion when, in fact, they were not;

d.    To provide unwarranted support to critics of the Ripoff Report website;

e.    To stifle the First Amendment rights of XCENTRIC and users of the Ripoff Report website;

f.    To cause XCENTRIC to divert its resources to defending a frivolous case rather than using those resources to improve the Ripoff Report site;

g.    To intimidate XCENTRIC into limiting the public's ability to use the Ripoff Report website to publish truthful information and access truthful information published by others;

h.    To wrongfully investigate Magedson's personal life and to obtain and publicly release personal, private, confidential and/or embarrassing information solely for the purpose of embarrassment and harassment.

73.     Defendants' wrongful conduct was the actual and proximate cause of injury, damage, loss, or harm to XCENTRIC in an amount in excess of $75,000.00, the exact amount of which shall be proven at trial.

74.     The actions of Defendants AEI, MOBREZ, LLANERAS and BLACKERT were willful, malicious, and the product of an evil hand guided by an evil mind. Defendants, and each of them, specifically intended to harm XCENTRIC to an extent sufficient to entitle it to recover punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

## WRONGFUL CONTINUATION OF CIVIL PROCEEDINGS

### (Against BORODKIN, AEI, MOBREZ, LLANERAS and BLACKERT)

75.     Xcentric incorporates the above allegations as if fully set forth herein.

76.     At the time the Asia Litigation was commenced, Defendants AEI, MOBREZ, LLANERAS and BLACKERT each knew the action was factually groundless as to each and every claim.

77.     As of no later than May 7, 2010, Defendants BORODKIN and BLACKERT knew, with absolute certainty, that Defendants MOBREZ and LLANERAS had committed perjury and that their claims of extortion were totally and completely fabricated and false.

78.     Following the deposition of Defendant MOBREZ on May 7, 2010, Defendant BLACKERT sent an email announcing his intent to withdraw from the Asia Litigation.  A true and correct copy of the email is attached hereto as **Exhibit I**.  In his email, Defendant BLACKERT stated, among other things, "You have to realize this is a shock to me. Per my own indepedent [sic] research I need to withdraw from the case and explain why. In light of todays events I have a serious conflict of interest and will withdraw as counsel … Moreover, I urged my client to dismiss this case."

79.     Despite expressing his understanding of the ethical requirement that he withdraw from the Asia Litigation, Defendant BLACKERT did not withdraw from the case.  Upon information and belief, Defendant BORODKIN actively urged and pressured BLACKERT not to withdraw and to continue pursuing the matter despite knowing that it was entirely groundless and unlawful.

80.     In or around August 2010, although he never formally withdrew from the matter, Defendant BLACKERT ceased participating in the Asia Litigation.   Upon information and belief, Defendant BLACKERT ceased participating in the action because he knew that doing so was unlawful, unethical, and wrongful.

81.     At no time did Defendant BORODKIN withdraw from the Asia Litigation.

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

16

**VERIFIED COMPLAINT**

82.     As alleged herein, the Defendants, and each of them, wrongfully continued the Asia Litigation without probable cause and knowing that the action was brought primarily for a purpose other than that of securing the proper adjudication of the claims in which the proceedings were based.

83.     Defendants' wrongful conduct was the actual and proximate cause of injury, damage, loss, or harm to XCENTRIC in an amount in excess of $75,000.00, the exact amount of which shall be proven at trial.

84.     The actions of Defendant AEI, MOBREZ, LLANERAS, BLACKERT and BORODKIN were willful, malicious, and the product of an evil hand guided by an evil mind.  Defendants, and each of them, specifically intended to harm XCENTRIC to an extent sufficient to entitle it to recover punitive damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### AIDING AND ABETTING TORTIOUS CONDUCT

#### (Against All Defendants)

85.     Xcentric incorporates the above allegations as if fully set forth herein.

86.     Upon information and belief, Defendants AEI, MOBREZ, LLANERAS, BLACKERT, BORODKIN and DOES 1–10 each aided and abetted each other in the Asia Litigation as alleged above.

87.     Upon information and belief, Defendants AEI, MOBREZ, LLANERAS, BLACKERT, BORODKIN and DOES 1–10 each were each aware that the other Defendants were engaged in the conduct alleged herein for which they are liable to XCENTRIC.

88.     Upon information and belief Defendants AEI, MOBREZ, LLANERAS, BLACKERT, BORODKIN and DOES 1–10 each provided substantial assistance or encouragement to each other with the intent of promoting their wrongful conduct.

89.     Defendants AEI, MOBREZ, LLANERAS, BLACKERT, BORODKIN and DOES 1–10, each acted in concert with one another during the wrongful commencement

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

17

and continuation of the Asia Litigation.  Pursuant to A.R.S. § 12–2506(D), Defendants and each of them are jointly and severally liable to XCENTRIC for any and all damages suffered.

90.    Defendants' wrongful conduct was the actual and proximate cause of injury, damage, loss, or harm to XCENTRIC in an amount in excess of $75,000.00, the exact amount of which shall be proven at trial.

91.    The actions of Defendant AEI, MOBREZ, LLANERAS, BLACKERT and BORODKIN were willful, malicious, and the product of an evil hand guided by an evil mind.  Defendants, and each of them, specifically intended to harm XCENTRIC to an extent sufficient to entitle it to recover punitive damages in an amount to be proven at trial.

## JURY DEMAND

Xcentric demands trial by jury as to all issues so triable.

**WHEREFORE**, Plaintiff XCENTRIC VENTURES, LLC prays that this Honorable Court enter judgment against Defendants as follows:

A.    For damages in an amount according to proof at trial;

B.    For punitive damages in an amount according to proof at trial;

C.    For an award of taxable costs;

D.    Any other relief deemed appropriate by the Court.

DATED July 18, 2011.

**GINGRAS LAW OFFICE, PLLC**

/S/ David S. Gingras
David S. Gingras
Attorneys for Plaintiff
XCENTRIC VENTURES, LLC

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

**VERIFIED COMPLAINT**

1

## **<u>VERIFICATION</u>**

2

3

4   I, EDWARD MAGEDSON, hereby state that I am the manager of XCENTRIC

5   VENTURES, LLC, I have read the foregoing Verified Complaint and know the contents

6   therein to be true to the best of my knowledge, except as to those matters herein stated

7   upon information and belief, and as to such matters, I believe them to be true.

8

9

10   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

11   United States of America that the foregoing is true and correct.

12

13   EXECUTED ON: July 18, 2011.

14   EDWARD MAGEDSON

GINGRAS LAW OFFICE, PLLC
3941 E. CHANDLER BLVD., #106-243
PHOENIX, AZ 85048

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19

**VERIFIED COMPLAINT**

Exhibit A

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

DANIEL F. BLACKERT, ESQ., CSB No. 255021
Asia Economic Institute
11766 Wilshire Blvd., Suite 260
Los Angeles, CA 90025
Telephone (310) 806-3000
Facsimile (310) 826-4448

JAN 2 7 2010

John A. Clarke, Executive Officer/Clerk

By ___A. WILLIAMS___
                        DEPUTY

Attorney for Plaintiffs, Asia Economic Institute, Raymond Mobrez, and Iliana Llaneras

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

ASIA ECONOMIC INSTITUTE, a California ) Case No.:      SC106603
LLC; RAYMOND MOBREZ an individual; and )
ILIANA LLANERAS, an individual, )
           ) COMPLAINT FOR:
         Plaintiffs, )
           )
     vs. )
XCENTRIC VENTURES, LLC, an Arizona )    (1)   **COMMON LAW DEFAMATION**
LLC, d/b/a as BADBUSINESS BUREAU )    (2)   **UNFAIR BUSINESS PRACTICES**
and/or BADBUSINESSBUREAU.COM and/or )    (3)   **VIOLATION OF 18 U.S.C. §**
RIP OFF REPORT and/or )                   **1962(c)**
RIPOFFREPORT.COM; BAD BUSINESS )    (4)   **VIOLATION OF 18 U.S.C. §**
BUREAU, LLC, organized and existing under )                 **1962(d)**
the laws of St. Kitts/Nevis. West Indies; )    (5)   **CIVIL CONSPIRACY**
EDWARD MAGEDSON an individual, and )    (6)   **DEFAMATION PER SE**
DOES 1 through 100, inclusive. )    (7)   **FALSE LIGHT**
                                           (8)   **INTENTIONAL INTERFERENCE**
         Defendants.                **WITH PROSPECTIVE**
                                           **ECONOMIC RELATIONS**
CASE MANAGEMENT CONFERENCE     (9)   **NEGLIGENT INTERFERENCE**
                                           **WITH PROSPECTIVE**
     MAY 1 7 2010                  **ECONOMIC RELATIONS**
           Date            (10)  **BREACH OF CONTRACT**
                                         (11)  **PRELIMINARY INJUNCTION**
JOHN L. SEGAL    Dept 0         (12)  **PERMANENT INJUNCTION**
                      8:30am

Plaintiffs, Raymond Mobrez ("Mobrez"), Iliana Llaneras ("Llaneras"), and Asia

Economic Institute ("AEI"), hereby allege as follows:

1

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SUMMARY OF THE ALLEGATIONS

1.      This case involves the use of Internet technology to perpetrate a complex extortion scheme against the Plaintiffs and silent majority (the public).  Defendants operate internet websites under the guise that they are a consumer advocacy regulatory body. In reality, however, Defendants are a non-governmental, non-regulatory, self-appointed authority. Defendants' websites allow single individuals to make anonymous, unwarranted proclamations, providing a platform to slander and defame without investigation, corroboration, justification, nor regulatory authority or standards of any kind. These statements have tainted Plaintiffs' reputations both nationally and internationally, and caused speculation and caution to those eager to work with Plaintiffs. As part of their elaborate extortionate and conspiracy-driven scheme, Defendants solicit from the public – with promise of pecuniary gain – so-called "Rip-off Reports" that contain negative, misleading, false, and defamatory content about businesses and individuals.  Additionally, Defendants promise to gain media exposure for posters.  For example, they promise the public to give "[…] you publicity needed to help your causes" and "will put you into contact with the media."  As such, Defendants are more than a passive sounding board for disgruntled consumers. They play an active role in demise of the reputation of businesses and individuals worldwide.


2.      Defendants utilize the website to market and sell their products, to solicit donations, and most egregiously, as a mechanism for extorting monies from individuals and businesses, such as Plaintiffs.  When victims of their salacious reports request their removal, Defendants demand their enrollment in the "Rip-Off Report's Corporate

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Advocacy, Business Remediation and Consumer Satisfaction Program." ("CAP").   In exchange for an exorbitant amount of money, Defendants will supplement the negative postings on their site with positive feedback. Additionally, Magedson change the original negative headings into a positive, thus allowing users of any popular search engine to view the positive commentary first. Likewise, Defendants post positive reviews about individuals or businesses enrolled in the CAP. These positive reviews are similarly placed ahead of the original, negative complaint. This has the effect of altering, supplementing, and/or adding to the posts by users thus exempting Defendants from immunity under § 230 of the Communication Decency Act.   Without payment, however, Defendants refuse to take further steps related to the false and defamatory posts afflicting the reported business and individuals. Victims of Magedson's disparaging reports are thus faced with the dilemma of three unsatisfactory choices: (1) live with the worldwide publication of defamatory misinformation about the particular victim, (2) accede to Magedson's extortive money demands, or (3) initiate an expensive lawsuit against Magedson (who has a lengthy history of evading service of process). In our case, Plaintiffs, like the countless number of businesses affected by Defendants' conduct, faced an additional predicament -- loss of their business.

## PARTIES

3.      Plaintiff, AEI, is a limited liability company, and, at all times relevant hereto, organized and existing pursuant to the laws of the State of California.   Plaintiffs' principal place of business is located at 11766 Wilshire Boulevard, Suite 260, Los Angeles, California 90025. AEI, a USA entity, has been in business for the last nine

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

years as a free on-line non-governmental publication, that publishes current news that is not involved in sales or marketing. Plaintiffs' business is an asset to the economy. AEI was in the process of providing work opportunities for numerous Americans who are currently unemployed.

4.      Plaintiff, Mobrez, is an individual and, at all times relevant hereto, a resident of California, County of Los Angeles.

5.      Plaintiff, Llaneras, is an individual and, at all times relevant hereto, a resident of California, County of Los Angeles.

6.      Defendant, Xcentric Ventures, LLC ("Xcentric") is a limited liability company organized and existing in Arizona with its purported domestic address as P.O. Box 470, Phoenix, Arizona 85280.    Xcentric does business as badbusinessbureau.com, ripoffreport.com and/or Badbusiness Bureau and/or Rip-off Report.  Xcentric is owned and operated by Defendant, Ed Magedson.  The domain is hosted by Intercosmos Media Group, Inc. with servers located in Ankara, Turkey.

7.      On    information    and    belief,    Defendants,    Badbusinessbureau,    LLC ("Badbusinessbureau") is a limited liability company organized and existing under the laws of St. Kitts/Nevis, West Indies, with its principal place of business in the State of Arizona and does business as Badbusinessbureau.com, Ripoffreport.com and/or

Badbusiness Bureau and/or Rip-off Report.  Badbusinessbureau is owned and operated by Defendant, Ed Magedson.

8.      On information and belief, Defendant, Ed Magedson ("Magedson") is an individual, and, at all times relevant hereto, is a resident of the State of Arizona. Magedson is the owner and operator of Xcentric and badbusinessbureau. Magedson runs and manages Defendants' websites solo.

9.      The true names and capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 to 10 are unknown to Plaintiffs at the present time, who therefore sues such Defendants by fictitious names, and will amend this Complaint to show their true names and capacities when ascertained.  Plaintiffs are informed and believe and thereon allege that each of the defendants assigned as a DOE is responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages to the Plaintiffs.

## JURISDICTION AND VENUE

10.     This action arises under California law and the amount in controversy exceeds the jurisdictional minimum of this Court.

11.     Jurisdiction is proper pursuant to Cal. Civ. Pro. Code § 410.10. Each Defendant has sufficient minimum contacts with California, is a citizen of California, or otherwise purposefully avails itself of benefits from California or doing business in California so as

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice. Specifically, this Court has personal jurisdiction over Defendants because of the following:

     a.     In an email from Defendant, Magedson to Plaintiff, Mobrez, Magedson claims to reside in California;

     b.     Defendants solicit donations from individuals and businesses in California;

     c.     Defendants have received donations from individuals and businesses in California;

     d.     Users of Defendants' websites reside in California;

     e.     Individuals and businesses in California have purchased merchandise from Defendants' websites;

     f.     Defendants sell advertising space to businesses located in California;

     g.     Individuals and businesses located in California have and continue to be enrolled in the CAP program; and

     h.     Defendants' legal directory – located on Defendants' websites – posts a listing of California attorneys who will litigate lawsuits (mostly class actions) for individuals and businesses who have complained on their site.

12.     Venue is proper pursuant to Cal. Civ. Pro. Code § 395. Defendants' obligation and liability arises in this county because Defendants' unlawful conduct substantially occurs in this judicial district and Defendants solicit and engage in business within this judicial district.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## FACTS

13.     Xcentric and badbusinessbureau own and operate websites with the following URLs http://ripoffreport.com and http://badbusinessbureau.com.   Any individual using the internet may access these websites for free.   Xcentric and badbusinessbureau is owned, operated, and managed by Magedson.


14.     Entering the preceding URLs: ripofffreport.com and badbusinessbureau.com, will direct internet users to identical websites with a common header identifying the website as "Ripoff Report."   The Complaint will refer to these websites as Defendants' websites.


15.     Defendants' websites pretend to be consumer advocacy websites.   They describe themselves as a "worldwide consumer reporting Website and publication, by consumers, for consumers, to file and document complaints about companies or individuals." Defendants' websites publish so-called "rip off reports" and purport to cover every category of product or service imaginable.   They further state that users can "[…] Browse the latest Reports, Search the Reports, or Submit your report now for FREE, by clicking on File Report."


16.     Defendants' websites state that users may submit so-called "rip off reports" for free.   Companies may submit rebuttals, but Defendants post them according to editorial guidelines that are more stringent than those applied to consumer complaints.   On

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

information and belief. Defendants have also refused and regularly refuse to post rebuttals.

17.      Defendants' websites allow users to sort through so-called rip-off reports by category, company or individual, city, state, country, and key words.

18.      In addition, Defendants use their websites to organize class action lawsuits, including providing the contact information of attorneys who will litigate such cases. In other words, Defendants refer legal cases to the attorneys listed on their websites. Users can also search for an attorney by State. On information and belief, Defendants solicit monies from attorneys in exchange for referring legal cases, mainly class actions.

19.      Defendants use its websites to solicit "non-tax deductible donations"[1] from individuals and businesses across the country, including California. The "donations" are to be sent to an Arizona Post Office Box. In addition, Defendants' websites contain advertisements that are sold to businesses, including those in California. On information and belief, those businesses that buy advertising space from Defendants may choose the State in which they wish to advertise. This is accomplished by using the IP address of the Internet users who visit Defendants' websites.

20.      Defendants use their websites to publish defamatory information about individuals and businesses throughout the United States, including California, and worldwide.      Defendants offer a program called CAP whereby they solicit significant

---

[1] Defendants' website admits these donations are "non-tax deductible."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

amounts of monies (in some cases as much as $250,000) from individuals and businesses that have been defamed on Defendants' websites. In exchange, Defendants allegedly conduct an independent investigation into the rip-off reports. After this "investigation," Defendants supplement and/or add to each posting a headline in order to reflect positive feedback (this essentially turns the negative post into a positive). Likewise, Defendants create positive posts about a business enrolled in CAP. These positive posts rebut each negative post and appear directly above each negative post. Defendants author these posts and headings. Further, if an individual or business is searched using an internet search engine, the positive posting from Defendants' website will appear, instead of the negative posts. In addition, if future negative posts are submitted, Defendants will not publish them.

21.     Defendants use their websites to market their book entitled "Rip-Off Report.com Do-It-Yourself: How to get Rip-off Revenge." This book is sold on Defendants' website entitled Ripoffrevenge.com. There is a link to Ripoffrevenge.com on Defendants' websites. Defendants benefit commercially from owning and operating these websites. This book teaches individuals and businesses how to get revenge against businesses.

## DEFENDANTS PROVIDE ACTUAL CONTENT FOR THEIR WEBSITES

22.     Defendants provide actual content of their websites, including, but not limited to the following:

    A.    Produce original content contained in the rip-off reports;
    B.    Produce original content in editorials, sometimes under the name "EDitor@ripoffreport.com";
    C.    Create the titles for rip-off reports;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

      D.      Create "META tags" for rip-off reports, which make the defamatory posts appear higher on the search engines. For example, if an individual and/or business types in their name on a search engine such as Google.com, the rip-off report title authored by Defendants will appear, in most cases, within the top 5 (however, usually in the top two) search engine results. Defendants author and use these so called "META tags" in violation of Google's terms of service, as well as in violation of other search engines terms of service.

      E.      Solicit individuals to submit so-called Rip-off reports with the promise that said individuals may receive compensation in exchange for their posts. [2]

      F.      Offer to link posters with attorneys for the purpose of filing lawsuits, especially class action lawsuits.

      G.      Upload content contained in the Rip-off reports; and

      H.      Exercise editorial control over rip-off reports, as well as rebuttals that are posted at the discretion of Defendant, Magedson (EDitor@ripoffreport.com).

23.     Defendants exercise exclusive control over the content of the Rip-off report websites. Defendant, Magedson will not allow users to edit or remove their posts under any circumstances. In an email to Plaintiffs, Defendant, Magedson boasted that not even the Pope himself could succeed in having complaints (true or not) removed from his websites. Copies of Plaintiffs and Defendants emails' are attached hereto, collectively, as Exhibit A.

## DEFENDANTS' PUBLICATIONS

24.     On or about February 2009, Plaintiffs conducted a search on Google.com ("Google") and/or Yahoo.com ("Yahoo") using the following terms: Raymond Mobrez, Mobrez, Iliana Llaneras, Llaneras, and Asia Economic Institute. The results were that said parties appeared on said search engines (usually in first 2-3 hits) as individuals who have been complained about on Defendants websites. This means that any individual who searches Plaintiffs' names on any search engine will yield results describing

---

[2] On information and belief, to date, Defendants have removed this content from its websites.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs as scam artists on Defendants' websites.  This has severely injured Plaintiffs' reputations and virtually halted its business.

25.     To date, there are four (4) reports regarding Plaintiffs on Defendants websites.  In addition. numerous comments from the original poster, as well as other posters, appear below the heading and each post.  These posts are defamatory, false, and malicious. They allege that Plaintiffs are engaged in criminal conduct, more particularly: racism, discrimination, fraud, money laundering, tax fraud, and violations of employment laws. Copies of these posts are attached hereto, collectively, as Exhibit B.  To date, said "rip-off reports" still remain on Defendants' websites. Defendants have refused to remove the false, defamatory posts pursuant to a policy whereby they claim to refuse to remove any posting under any circumstances, even when presented with evidence that the posts are false.  However, if Plaintiff opted to participate in the CAP and pay Defendants' extortionate demands. Defendants would have modified the posts by adding positive feedback.

26.     In order to be eligible for the CAP Defendants require that a defamed business or individual admit that the posts are true and then take steps prescribed by Defendants in order to remedy the alleged problem areas as specified in the posts.  Defendants require that a business wishing to join the CAP fill out a preliminary form, which can be found on Defendants' websites.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

27.     Defendants' websites publish negative, false, misleading, and defamatory statements regarding businesses and individuals.


## THE SHAKEDOWN

28.     On February 15, 2009, Plaintiff, Mobrez, sent Defendants a cease and desist letter asking them to remove the defamatory poats.  On or about May 2009, Plaintiff, Mobrez contacted Defendants to inform them that he, his business partner and his business had been defamed on Defendants websites.  Mobrez further informed Defendants that the postings were false and offered proof of their falsity.  The defamatory posts included, but are not limited to, the following:

A.     "Asia Economic Institute lie cheat tax fraud, (sic)."
B.     "Promised work visas, reference letters, and numerous raises and they have failed every time."
C.     "They reduce pay illegally."
D.     "Knowingly take advantage of workers."
E.     "Internet sweatshop."
F.     "Complete disorganization."
G.     "They are laundering money."
H.     "They have no idea how to run any business and continue to ruin people's lives."
I.     "Credentials of Raymond Mobrez [...] and Iliana Llaneras, are as muddled as they possibly can be [...] The truth is there are no credentials to back up the scheme that they are running."
J.     "Raymond explained to me that he hires & fires based on race, religion, gender, etc. Raymond told me girls are good for administrative tasks, especially Filipinas, because they do what they are told. Raymond told me not to trust Persians and Muslims. He told me the 'blacks' only want to work in entertainment so you should not hire them. This is offensive and illegal. Obviously."
K.     "Asia Economic Institute it's a SCAM."
L.     "Mobrez and Llaneras deserve serious legal punishment for ruining my life."
M.     "[...] Raymond Mobrez ?? [...] sewage, unscrupulous, mendacious, buffoonish cretin."
N.     "They routinely ignore employment laws."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

O.   "[...] Shady business practices [...] in which he and Iliana engage."

29.   Mobrez offered to meet Defendant, Magedson to discuss Plaintiffs' options. In an email response Magedson stated "I am in California, ... I live here now, (sic.)" but nevertheless refused to meet with Plaintiffs. See Exhibit A.

30.   In response, Defendants informed Mobrez that it would not remove the defamatory posts even if they were false. Defendants further offered to enroll Plaintiffs in the CAP program for a fee of at least five thousand dollars ($5,000), plus a monthly monitoring fee. Defendants sent Mobrez lengthy information regarding the CAP.

31.   In an email from Defendants to Plaintiffs, dated May 12, 2009, explained that the CAP works as follows:

> "☐ This program changes the negative listings on search engines into a positive along with all the Reports on Rip-off Report .... (Reports are never deleted).
> ☐  As a condition of joining this program, the Reported business allows us to email everyone who filed a complaint that the business has contacted Rip-off Report and wants to make things right. This weeds out false Reports and shows your commitment to your customers and is later Reported in our findings about your company [sic.]we post to every Report about your business.
> ☐  You must live up to your stated commitments through our program requirements.
> ☐ Read about this program and how it changes all the negative into a positive - fill out our Corporate Advocacy Program intake form."

32.   It is important to note that Defendant, Magedson, by his own admission, clearly states that the CAP "[...] changes the negative listing on search engines into a positive along with all the Reports on Rip-off Report..." As a result, Defendants can not be afforded protection under §230 of the CDA.

13

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

33.    Defendants informed Mobrez that as a predicate to enrolling in the CAP program, he would have to admit his guilt and concede to the truth of the postings.  Mobrez refused and informed Defendants, again, that the posts were false and offered to prove their fallacy.  Defendants further informed Mobrez that it would not do anything about the posts until it was paid a fee of approximately five thousand dollars ($5,000), plus additional monthly monitoring fees.  Plaintiff, Mobrez pleaded with Defendants to change the posts; however Defendant, Magedson refused to do anything until he was paid.

34.    The implication was clear that for a fee, Defendants would correct the content of the defamatory posts.

35.    In summary, Defendants offered to provide a correction to reports that it knew or should have known to be false for a fee.  Defendants offered to write editorials and headlines disputing the false and defamatory information posted on Defendants' websites in exchange for a substantial fee.

36.    A significant portion of Defendants' revenue stream comes from the CAP.  This is not an isolated incident and numerous individuals. as well as businesses. have been approached by Defendants with this identical scheme.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

37.     Defendants know that the information published on its websites will dissuade prospective customers from doing business with Plaintiffs, as well as individuals from applying to or working for Plaintiffs.  Here, Plaintiffs have been severely affected by these defamatory posts.  Businesses and individuals have refused to do business with Plaintiffs.  In addition, individuals have been dissuaded from working with Plaintiffs.  Plaintiffs' goodwill has been destroyed.  For example, one of the posts on Defendants' websites reads as follows:

> "I was considering starting a position at this company after having an interview with Raymond.  [...]  He told me to come into the office tomorrow at 11am to start work, but as a result of these reports I am going to blow him off."

38.     Defendants are aware that the complaints published on its websites are likely untrue.  It is not difficult for Defendants to ascertain the legitimacy of complaints: Defendants can determine the veracity of posts by engaging in minimal contact with the "victim" that has written the report(s).

## DEFENDANTS ARE ACTING AS A REGULATORY BODY BY IMPOSING PENALTIES AND CLOSING DOWN BUSINESSES

39.     Defendants represent themselves as consumer advocates, yet their actions are gilded by private, for-profit motives.  They mislead the public in an attempt to sell merchandise, advertising space, solicit donations, and extort monies from individuals and businesses.

40.     Defendants' misrepresentations to the public are numerous.  For example, Defendants published (on their websites) Defendant, Magedson's editorial on the Better

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Business Bureau ("BBB"). Defendants claim that the BBB should not be trusted because it solicits monies from the businesses that it is supposed to monitor. In reality, this is exactly what Defendants are doing. In fact, Defendants websites have a negative rating with the BBB.

41.     Defendants do not describe their extortion scheme on their websites, thus giving the public the false impression that Defendants are consumer advocates without any interest in pecuniary gain. This could not be further from the truth. Defendants gain a substantial income from their extortion scheme.

42.     Numerous businesses and individuals have been harmed financially as a result of Defendants extortion scheme. In addition, many businesses have been forced to close down. As a result of said conduct, at any given time there are a substantial number of lawsuits pending in state and federal courts against Defendants. There are also many websites, new reports, and investigative reports that criticize Defendants and their websites for operating an extortion scam.

## FIRST CAUSE OF ACTION
## COMMON LAW DEFAMATION

43.     Asia Economic Institute re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

44.     Defendants published defamatory materials on Defendants' websites regarding Plaintiffs.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

45.     The publications contain false and misleading information and have brought Plaintiffs into disrepute among members of the marketplace. In addition, said defamatory comments have harmed Plaintiffs' integrity, good-will, reputation, and good name in the community. Plaintiff does not advertise and relies on word of mouth as its primary resource to gain customers.

46.     Defendants knew or should have known that the defamatory posts would cause serious harm to Plaintiffs. Defendants intended that the defamatory posts impact the way the public views Plaintiffs, as well as their business.

47.     Defendants knew that the publications included false information or otherwise acted with reckless disregard of the truth or falsity contained in their publications. Further, Defendants refuse to investigate the truth or falsity of such statements to the detriment of Plaintiffs, as well as other businesses and individuals.

48.     Defendants' publications damaged Plaintiffs' business reputation and have prejudiced it in the conduct of its business, and have deterred customers and potential customers from dealing with it.

49.     Plaintiffs have been injured in its reputation, business, and property by reason of Defendants' publications in an amount to be determined at trial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SECOND CAUSE OF ACTION
## UNFAIR BUSINESS PRACTICES. CALIFORNIA BUSINESS CODE § 17200

50.     Asia Economic Institute re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

51.     Plaintiffs have standing pursuant to California Business and Professional Code Section 17204. Plaintiffs allege violations of Cal. Bus. & Prof. Code § 17200 on behalf of themselves and the public (Private Attorney General).

52.     Defendants' acts and practices as alleged herein constitute unlawful, unfair, and/or fraudulent business practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. *et seq.*

53.     Defendants Magedson. Xcentric Ventures, and Badbusinessbureau.com are engaged in unlawful business acts or practices by, among other things:

(a) Defendants have repeatedly attempted to obtain AEI's property through wrongful use of actual or threatened fear by requiring payment to remedy the publication of false and defamatory statements that Defendants created and/or solicited. This conduct amounts to extortion under 18 U.S.C. § 1962(c).

(b) Defendants have repeatedly and intentionally used their Websites as a scheme to obtain money from AEI and other companies by means of false and defamatory complaints created or solicited by Defendants. This conduct amounts to wire fraud under 18 U.S.C. § 1343.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

54.     Defendants Magedson, Xcentric Ventures, and Badbusinessbureau.com are
engaged in unfair business acts or practices by, among other things:

(a) Defendants have engaged in conduct the utility of which is outweighed by the
gravity of the consequences to the Plaintiffs and the public.

(b) Defendants have engaged in conduct that is immoral, unethical, unscrupulous, and
substantially injurious to Plaintiff and the public.

(c) Defendants have engaged in conduct that undermines and violates the policies set
out in 18 U.S.C. § 1962(c) and 18 U.S.C. § 1343.

55.     Defendants Magedson, Xcentric Ventures, and Badbusinessbureau.com are
engaged in fraudulent business acts or practices by, among other things:

(a) Defendants represent themselves as consumer advocates. However, this
description is false and misleading. Defendants not describe the aforementioned
extortion scheme on its websites, thus giving the public the false impression that
Defendants are consumer advocates without any interest in pecuniary gain. In
fact, on information and belief, Defendants gain a substantial income from its
extortion scheme.

56.     Without injunctive relief, the Plaintiffs and others similarly situated will
continued to be harmed by the Defendants' unlawful, unfair and fraudulent business
practices. In addition, Plaintiff is entitled to recover its costs of suit and attorney.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## THIRD CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. § 1962(c), R.I.C.O.

57.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

58.     Defendant, Badbusinessbureau is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and was engaged in activities affecting interstate commerce.

59.     Defendant, Xcentric is an "enterprise" within the meaning of 18 U.S.C §§ 1961(4) and 1962(c) and was engaged in activities that affected interstate commerce.

60.     Defendant, Magedson is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

61.     Magedson was and is associated with Defendants Badbusinessbureau and Xcentric and has control over these enterprises such that he can conduct and participate in the conduct of Defendants Ripoffreport.com and Xcentric Ventures.

62.     On or about May 5, 2009, Mobrez, on behalf of AEI, sent an e-mail to Ripoffreport.com advising it that it was posting false and defamatory information about the company.  Magedson responded via e-mail describing the websites policies and referring the Plaintiffs to the "Rip-off Report's Corporate Advocacy, Business

Remediation and Customer Satisfaction Program." The program promised, among other things. to "change[] the negative listings on search engines into a positive along with all the Reports on Rip-off Report." The pair later spoke by telephone, during which Magedson offered to enroll the Plaintiffs in the abovementioned program for an initial fee of $5.000 plus additional monthly monitoring fee. One week later, after Plaintiffs failed to fill out the appropriate paperwork, Magedson sent Mobrez an e-mail requesting he fill out the forms necessary to join the program.

63.    Plaintiffs rejected Defendants' attempt to wrongfully collect and extort monies from their funds. Nevertheless, Defendants' program amounts to attempted extortion under 18 U.S.C. § 1951, which is a predicate act listed in 18 U.S.C. § 1961(1).

64.    Additionally, the electronic and telephonic communication between Mobrez and Magedson constitute several predicate acts sufficient to establish a "pattern of racketeering activity" as that term is defined in 18 U.S.C. § 1961(1) and (5).

65.    In addition. Defendants and individuals associated with them have perpetrated this scheme upon other entities. According to court records. other individuals have had similar offers made to them from Ed Magedson and Ripoffreport.com to address negative. false. misleading, and defamatory posts.

66.    The overall scheme and design of the websites as a means to extort money from companies such as Plaintiff and the fraudulent claims made in furtherance of that scheme

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

constitute violations of 18 U.S.C. § 1341, particularly here where all of the communications are made over the Internet.

67.    The activities of Defendants described in this claim were taken intentionally and with full knowledge of the intended results of the scheme to extort money, including knowledge of false and fraudulent representations to unlawfully deprive Plaintiffs of their money for Defendants' pecuniary gain.

68.    The Defendants' violation of 18 U.S.C. § 1962(c) has caused Plaintiffs to lose prospective employees and has damaged Plaintiff's business, goodwill, and reputation. The Defendants' unlawful conduct has caused damages to Plaintiff, in an amount to be determined at trial, and threatens to cause additional damage. Plaintiffs are also entitled to treble damages, as well as other relief which is necessary and proper, including reasonable attorneys' fees and costs.

<div align="center">

FOURTH CAUSE OF ACTION
VIOLATION OF 18 U.S.C. § 1962(d)

</div>

69.    Asia Economic Institute re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

70.    Magedson and other unnamed individuals associated with Badbusinessbureau and Ed Magedson, have conspired and agreed to violate 18 U.S.C. § 1962(c) by agreeing to conduct an enterprise affecting interstate commerce, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The acts in

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

furtherance of this conspiracy are alleged herein, including specifically (but not limited to) Paragraphs 57 to 68.

71.    Plaintiffs have been injured in its business and property by reason of the foregoing violations of 18 U.S.C. § 1962(d) as alleged in this claim in an amount to be determined at trial. Plaintiff is also entitled to treble damages, as well as other relief which is necessary and proper, including reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
## CIVIL CONSPIRACY

72.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

73.    Defendants and persons unknown to the Plaintiffs at this time have had a common design by means of concerted action to solicit, develop, create, and publish on Defendants' websites false and defamatory statements about the Plaintiffs.

74.    Defendants and persons unknown to the Plaintiffs at this time have solicited, developed, created, and published on the Websites such false and defamatory statements.

75.    Defendants and persons unknown to the Plaintiffs at this time have created the CAP. Through this "program," Defendants offer to resolve disputes between targeted companies and complainants. This service is offered and advertised on Defendants' websites.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

76.    Plaintiff Raymond Mobrez informed Magedson of false statements regarding the Plaintiffs on its website.

77.    Magedson demanded payment and participation in the CAP before taking any action to remedy the false and misleading statements.

78.    These actions constitute civil conspiracy to use coercion to obtain Plaintiffs' property. These actions also constitute a civil conspiracy to create, solicit, and publish defamatory and false statements regarding Plaintiffs.

79.    These actions have caused the Plaintiffs to incur loss and damages and entitled Plaintiffs to compensatory and punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## DEFAMATION PER SE

80.    Asia Economic Institute re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

81.    Defendants published the statements attached hereto at EXHIBIT B.

82.    The complaints published by Defendants regarding Plaintiff are false and were published with malice and reckless disregard for the truth or falsity of such stories with

intent to injure Plaintiff, its business reputation, and to illegally divert prospective employees from the Plaintiff's employ.

83.     Defendants do not verify the truth or accuracy of the stories contained on their websites. Defendants publish the stories and hold Plaintiffs out to the public as a "rip-off."

84.     The stories published and written by the Defendants contain false information about the Plaintiffs' business relationships and falsely allege the Plaintiffs are engaged in criminal conduct. Such statements include that AEI is "laundering money," that AEI "lie cheat tax fraud," "reduce pay illegally," and is a "SCAM." These false statements constitute defamation per se under all applicable laws.

85.     The false statements of fact published on the Defendants' website are unambiguous and when read by the public searching for the Plaintiffs, the libelous nature of such statements are clear. A reasonable person would have understood these statements to mean that Plaintiffs have committed a crime.

86.     As a direct and proximate result, Plaintiffs have been damaged in its good name and reputation, has suffered great loss of its goodwill, has suffered diminution in its value as a business entity, has lost prospective employees, and it continue to suffer increasing damages on a daily basis. Defendants' defamatory publication entitles AEI to compensatory and punitive damages in an amount to be determined at trial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SEVENTH CAUSE OF ACTION
### FALSE LIGHT

87.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

88.     Defendants' statements have placed Plaintiffs in a false light by representing Plaintiffs as scam artists, criminals, racists, unqualified, and incapable of providing a valuable service to the community. It is important to note that Plaintiffs have provided valuable resources for the public and wish to continue to do so. However, Defendants so-called "rip-off reports" have tainted Plaintiffs business, so much so that Plaintiffs have lost and continue to lose countless business relationships and employees. In other words, the defamatory posts posted on Defendants' websites have halted Plaintiffs' business.

89.     The false light in which Plaintiffs have been placed as a result of the Defendants' statements would be highly offensive to a reasonable person in the Plaintiffs' position.

90.     Defendants knew that the statements were false, or Defendants acted in reckless disregard for the truth or falsity of those statements.

91.     As a direct and proximate result of Defendants' wrongful statements, Plaintiffs have sustained harm to their business in an amount to be proven at trial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## EIGHTH CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

92.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

93.     AEI had valid contractual relationships with current and prospective employees and had expected relationships with persons who, but for Defendant's libelous publications, would have entered into valid contractual relationships.

94.     Defendants knew, when falsely and publicly making these defamatory statements about the Plaintiffs, that Plaintiffs had these valuable contracts and business expectancies.

95.     Defendants intentionally and wrongfully interfered with these relationships by knowingly publishing, creating, and soliciting negative, false, and defamatory content in exchange for their own business profit.

96.     As a result of the Defendants' wrongful conduct, the relationship between the Plaintiffs and its employees has been disrupted. In fact, one complainant claims that he was "considering starting a position at this company..." until he "came home and googled his name, and found all these bad reports." The complaint further asserts that "as a result of these reports, [he is] going to blow him off."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

97.     As a direct and proximate results of the foregoing wrongful acts, Plaintiffs have been damaged in their good name and reputation. have suffered great loss of its goodwill, has suffered diminution in its value as a business entity, has lost current as well as prospective employees, and it continues to suffer damages. Defendants' tortious interference with AEI's business relations entitles AEI to compensatory and punitive damages in an amount to be determined at trial.

<div align="center">

### NINTH CAUSE OF ACTION
### NEGLIGENT INTERFERENCE WITH A PROSPECTIVE ECONOMIC RELATIONS

</div>

98.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

99.     AEI had valid contractual relationships with current and prospective employees and had expected relationships with persons who. but for Defendant's libelous publications. would have entered into valid contractual relationships.

100.    Defendants knew, when falsely and publicly making these defamatory statements about the Plaintiffs. that Plaintiffs had these valuable contracts and business expectancies.

101.    Defendants negligently interfered with these relationships by knowingly publishing and creating negative. false. and defamatory content in exchange for their own business profit.

<div align="center">

28
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

</div>

102.   The relationships between the Plaintiffs and its employees were thereafter disrupted by the Defendants' conduct.

103.   As a direct and proximate results of the foregoing wrongful acts, Plaintiffs have been damaged in their good name and reputation, have suffered great loss of its goodwill, has suffered diminution in its value as a business entity, has lost current as well as prospective employees, and it continues to suffer damages. Defendants' tortious interference with AEI's business relations entitles AEI to compensatory and punitive damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
## INDUCING BREACH OF CONTRACT

104.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

105    AEI had a valid contractual relationships with current and prospective employees.

106.   Defendants knew, when falsely and publicly making these defamatory statements about the Plaintiffs. that Plaintiffs had these valuable contracts.

107.   Defendants intentionally and wrongfully interfered with these relationships by knowingly publishing and creating negative, false, and defamatory content in exchange for their own business profit.  Defendants intentionally and wrongfully caused these employees to breach their employment contracts with Plaintiffs.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

108.    As a result of the Defendants' wrongful conduct, the relationship between the Plaintiffs and its employees has been disrupted. In fact, one complainant claims that he was "considering starting a position at this company..." until he "came home and googled his name, and found all these bad reports." The complaint further asserts that "as a result of these reports, [he is] going to blow him off."

109.    Defendant's wrongful conduct is, therefore, a substantial factor in causing Plaintiffs' harm.

110.    As a direct and proximate results of the foregoing wrongful acts, Plaintiffs have been damaged in their good name and reputation, have suffered great loss of its goodwill, has suffered diminution in its value as a business entity, has lost current as well as prospective employees, and it continues to suffer damages. Defendants' tortious interference with AEI's contractual relations entitles AEI to compensatory and punitive damages in an amount to be determined at trial.

<u>ELEVENTH CAUSE OF ACTION</u>
<u>PRELIMINARY INJUNCTION</u>

111.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

112.    Defendants Magedson, Xcentric Ventures, Badbusinessbureau.com have wrongfully and unlawfully solicited, developed, and published on the Websites numerous false and misleading statements of fact concerning AEI and its owners.

113.    On or about May 5, 2009, Plaintiff Mobrez requested that defendants remove these false and defamatory statements from the Ripoffreport.com website. Defendants have refused, and still refuse, to remove false and misleading statements after repeated requests by the Plaintiffs.

114.    Plaintiffs have been and will continue to suffer immediate and irreparable damage if Defendants are not enjoined during the pendency of this lawsuit from disseminating or publishing false, misleading, and defamatory comments regarding AEI, Mobrez, and Llaneres. The dissemination or publication of these false, misleading, and defamatory posts continues to impact AEI's business opportunities and dissuades prospective clients from doing business with AEI.

115.    Plaintiff has no adequate remedy at law for the injuries being suffered as the Plaintiff will be forced to institute a multiplicity of suits to obtain adequate compensation for their injuries.

116.    There is a substantial likelihood that Plaintiffs will prevail on the merits. Defendants have been repeatedly notified to cease and desist disseminating or publishing these defamatory statements concerning AEI and its business, but they have continued to

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

host such statements on their Websites with the understanding that such disparaging acts would be detrimental to the Plaintiffs.

117.    Any harm associated with the entry of a preliminary injunction is outweighed by the potential damage to AEI's goodwill and reputation. Defendants will not suffer monetary losses if they are forced to remove the false and defamatory statements regarding the Plaintiffs.

118.    Further, the public interest will be served by preventing the dissemination of false and misleading statements about other businesses and individuals.

### TWELFTH CAUSE OF ACTION
### PERMANENT INJUNCTION

119.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

120.    Plaintiffs further ask the Court to set its application for injunctive relief for a full trial on the issue in this application, and after the trial, to issue a permanent injunction against Defendants from disseminating or publishing false, misleading, and defamatory statements concerning the Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against defendants:

1.  For general damages according to proof;

2.  For special damages according to proof;

3.  For punitive damages according to proof;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4. For violations of sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO), codified at 18 U.S.C. §§ 1962(c) and 1962(d), three times Plaintiff's actual damages;

5. For a preliminary injunction requiring Defendants to remove from the Website any false and defamatory statements concerning AEI or its employees and prohibiting Defendants from later publishing such statements on the Websites;

6. For a permanent injunction requiring Defendants to remove from the Websites any false and defamatory statements concerning AEI or its employees, and prohibiting Defendants from later publishing such statements on the Websites;

7. For prejudgment interest at the legal rate;

8. For costs of suit incurred herein;

9. For attorneys' fees; and

10. For such other and further relief as the Court may deem just and proper.

DATED: January 26, 2010

Asia Economic Institute

By: _____
DANIEL F. BLACKERT
Attorneys for Plaintiffs,
Asia Economic Institute, Raymond
Mobrez, and Iliana Llaneras

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Exhibit B

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV10-1360-SVW-PJWx | Date | April 19, 2010 |
|---|---|---|---|
| Title | Asia Economic Institute et al v. Xcentric Ventures LLC et al | | |

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |
|---|---|

| Paul M. Cruz | Deborah Gackle | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Daniel F. Blackert<br>Lisa Boradkin | David S. Gingras |

**Proceedings:**     1. DEFENDANTS XCENTRIC & MAGEDSON'S SPECIAL MOTION TO STRIKE & MOTION TO REQUIRE RICO CASE STATEMENT [9] (fld 03/22/10)
2. NEW CASE STATUS CONFERENCE

Hearing and conference held. The motion is denied. Order to issue. The case is set for jury trial on August 3, 2010 at 9:00 a.m. Pretrial Conference is set for 3:30 p.m. Within two weeks, plaintiff shall file a declaration describing meetings with any representative of defendant regarding extortion. Defendant, within ten days of receipt of plaintiff's declaration, shall file a declaration on the same issue. Also, within ten days, the parties shall meet and confer to exchange initial disclosures. The Court bifurcates damages and RICO claims. The trial will only address extortion. Motions for summary judgment may be filed anytime prior to the trial.

|  | : | 10 |
|---|---|---|
| Initials of Preparer | | PMC |

Exhibit C

DANIEL F. BLACKERT, ESQ., CSB No. 255021
LISA J. BORODKIN, ESQ. CSB No. 196412
**Asia Economic Institute**
11766 Wilshire Blvd., Suite 260
Los Angeles, CA 90025
Telephone (310) 806-3000
Facsimile (310) 826-4448
Daniel@asiaecon.org
Blackertesq@yahoo.com
lisa@asiaecon.org
lisa_borodkin@post.harvard.edu

Attorney for Plaintiffs,
Asia Economic Institute,
Raymond Mobrez, and
Iliana Llaneras

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIA ECONOMIC INSTITUTE, a California LLC; RAYMOND MOBREZ an individual; and ILIANA LLANERAS, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> XCENTRIC VENTURES, LLC, an Arizona LLC, d/b/a as BADBUSINESS BUREAU and/or BADBUSINESSBUREAU.COM and/or RIP OFF REPORT and/or RIPOFFREPORT.COM; BAD BUSINESS BUREAU, LLC, organized and existing under the laws of St. Kitts/Nevis, West Indies; EDWARD MAGEDSON an individual, and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 2:10-cv-01360-SVW-PJW <br><br> **DECLARATION OF RAYMOND MOBREZ PURSUANT TO THE COURT'S ORDER ON APRIL 19, 2010 REGARDING PLAINTIFFS' RICO AND EXTORTION CAUSES OF ACTION** <br><br> Judge: Stephen V. Wilson <br> Trial Date: August 3, 2010 <br> Time: 9:00 AM <br> Courtroom: 6 |

I, Raymond Mobrez, declare under penalty of perjury as follows:

1.      My name is Raymond Mobrez. I am a resident of that State of California, and am over the age of 18 years, and if called to testify in court or other proceeding I could and would give the following testimony which is based on my own personal knowledge unless otherwise stated.

2.      I am a principal of Asia Economic Institute ("AEI"). AEI had been in business in California for the past nine years. At the time the defamatory posts were posted on Ripoff report, AEI operated as a free, on-line, non-governmental publication of current news and events.

3.      On or about February 2009, Ms. Llaneras and I conducted a search on Google.com ("Google") and/or Yahoo.com ("Yahoo") using the following terms: Raymond Mobrez, Mobrez, Iliana Llaneras, Llaneras, and AEI. Within the first few search results, our names appeared in association with a "Ripoff Report." The resulting text also claimed that we had exploited our employees and warned search engine users not to work for AEI. The posts are attached to Plaintiffs' Complaint.

4.      On February 15, 2009, I sent an e-mail to Ripoff Report informing the Defendants of the "outlandish lies" published on their Web site. In an effort to avoid the judicial process, I simply requested that the Defendants remove the posts from their Web site and identify the individuals responsible. Likewise, I informed Defendants "Your false publishing has caused me and others that you have named hardship and enormous loss." At this time, I made Defendants aware of the damage we were suffering because of these posts. Specifically, I told him he had put me out of business. He was not responsive. Attached hereto as EXHIBIT A is a true and accurate copy of my February 15, 2009 e-mail to Defendants. Defendants never responded.

5.      After there had been no response, AEI filed a "Rebuttal" on April 3, 2009 for each report listed on the Ripoff Report Web site at that time. These "rebuttals," however, do not appear as "results" on Internet search engines such as Google and Yahoo.  Attached hereto as EXHIBIT B is a true and accurate copy of the rebuttal.

6.      On April 29, 2009, I contacted the Ripoff Report office using the telephone number listed on its Web site. I was taken through a series of voice prompts which eventually led me to someone who identified himself as the "EDitor." The speaker immediately inquired into the size and profitability of my business. Based on my recollection, the speaker asked, among other things, whether my company was internationally based, the size of the company, and how we were making money.  I responded that AEI is an American company that has been shut down by the accusations posted on his Web site.  Later in our conversation, he boasted that Ripoff Report was at the top of all the search engines. The call was disconnected immediately thereafter.  Attached hereto as EXHIBIT C is a true and accurate copy of Mr. Mobrez's phone records from April 27, 2009.

7.      I immediately re-dialed the number. During this brief conversation, the "EDitor" asked if we had read about his Advocacy program. Having not been aware of this program, I asked what the program entailed. Our phone call was again disconnected.  See EXHIBIT C to confirm the second phone call

8.      Again, I re-dialed the number. During this conversation the "EDitor" told me to read the information online regarding his "CAP." He instructed me to fill out an on-line form. I was then asked to send an e-mail to "EDitor@ripoffreport.com" identifying myself and describing the reason for my phone call. See EXHIBIT C to confirm the third phone call.

9.     On the following day, I sent an e-mail to "EDitor@ripoffreport.com" as instructed. I offered to prove the falsity of the posts and requested the assistance of the "EDitor" in removing the bogus reports from his Web site. Attached hereto as EXHIBIT D is a true and accurate copy of my April 28, 2009 e-mail to Defendants.

10.    On May 5, 2009, I again contacted the Ripoff Report office by phone. I asked the man, who now identified himself as Ed Magedson, if he had received the e-mail I sent to him on February 28, 2009. Mr. Magedson responded that I would need to enroll in the CAP program. Again, I asked for more information regarding the program, including the cost of participation. Mr. Magedson proceeded to describe his Web site and how it could benefit us. He then emphasized that his Web site has immunity under the law and, therefore could not be sued. Moreover, he claimed to have a team of lawyers that would fight us if we chose to sue him. He further warned that others had tried but failed and that it was best to just "go with the program." Ms. Llaneras witnessed this conversation from her office phone. Attached hereto as EXHIBIT E is a true and accurate copy of Mr. Mobrez's phone records from May 5, 2009.

11.    After our conversation, I re-sent Mr. Magedson the April 28th e-mail. Attached hereto as EXHIBIT F is a true and accurate copy of my May 5, 2009 e-mail to Defendants.

12.    On May 5, 2009, Mr. Magedson made a lengthy response describing, among other things, the "Rip-off Report's Corporate Advocacy, Business Remediation and Customer Satisfaction Program." The program, as described by Mr. Magedson's e-mail, promised to change "the negative listings on search engines into a positive along with all the Reports on Rip-off Report." I never threatened to sue Mr. Magedson or his company; yet, the e-mail warned that a lawsuit against the Web site was a losing battle. The e-mail boasted that the Web site "NEVER

lost a case" and that suing would "only get [us] more publicity and additional listings on search engines." EXHIBIT G is a true and accurate copy of Defendants' e-mail.

13.     Later that day, I responded to Mr. Magedson's e-mail by phone. I told Mr. Magedson that I had received his e-mail and was still uncertain what he wanted me to do. Mr. Magedson responded that I would have to go onto his Web site and enroll in the CAP program. When asked what it would cost for us to participate in his program, Mr. Magedson replied that it would cost us at least "five grand" plus a monthly maintenance fee of a couple hundred dollars. He stated that these charges were based on the size if company.  Specifically, he stated that the more money a company made, the more they would be charged.  When asked the reasoning behind this, he was not responsive.  He again instructed me to fill out the CAP forms. Again, Ms. Llaneras listened from her office phone.  See EXHIBIT E to confirm Mr. Mobrez's phone call.

14.     On May 12, 2009, I contacted Mr. Magedson by phone. This phone call lasted approximately 17 minutes. During this time, I told Mr. Magedson that I was hesitant to join his program because I could not stipulate to the allegations in the posts because they were not true. Again, I offered to prove their falsity.  He was not responsive.  Mr. Magedson said that I would have to agree to his terms in order for him to help. When asked what we would receive if we paid the fees he demanded, Mr. Magedson claimed that "all the negative goes away and you see the positive." At the conclusion of this phone call, Mr. Magedson again insisted that we fill out the necessary paperwork.  He told me that once I filled out the form and entered CAP "all of the negative goes away and you see the positive." Ms. Llaneras witnessed this conversation from her office.  EXHIBIT H is a true and accurate copy of Mr. Mobrez's phone records from May 12, 2009.

15. Later that day, I received an e-mail from Mr. Magedson. The e-mail complained that I had driven Mr. Magedson "crazy" because I "never filled out the form." Again, Mr. Magedson provided me with a link to the required application form for the CAP. Attached hereto as EXHIBIT I is a true and accurate copy of Mr. Magedson's May 12, 2009 e-mail.

16. On July 24, 2009, I responded the above e-mail and again informed Mr. Magedson that I was hesitant to join the CAP. I refused to stipulate to the false accusations posted on his Web site. Again, I offered to disprove the veracity of the posts and offered to meet with Mr. Magedson in person to discuss the terms of the CAP. Attached hereto as EXHIBIT J is a true and accurate copy of my May 5, 2009 e-mail to Defendants.

17. In his e-mail response dated July 24, 2009, Mr. Magedson stated that there was no sense of meeting. He reiterated that the Web site never removes the reports. He claimed that "even if you were the pope.. (sic.) It would not make a difference." Again, he expressed that the Web site has "spent over 3.4 million in legal fees and never lost a case." Attached hereto as EXHIBIT K is a true and accurate copy of Mr. Magedson's July 24, 2009 e-mail.

18. Despite the unremitting damage to my company, I refused to participate in the CAP. Again, I pleaded with him that he put us out of business and ruined our names. Sadly and, yet again, he was not responsive and, not surprisingly, again brought up the topic of money. Because we refused to pay Mr. Magedson, the accusatory posts continue to appear on Internet search engines such as Yahoo and Google.

19. Attached hereto as EXHIBIT L true and accurate copies of hand written notes taken by me during my telephone conversations with Mr. Magedson.

///

///

///

///

///

Pursuant to 28 U.S.C., Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED ON: April 2, 2010.

Raymond Mobrez

Exhibit D

DANIEL F. BLACKERT, ESQ., CSB No. 255021
LISA J. BORODKIN, ESQ. CSB No. 196412
**Asia Economic Institute**
11766 Wilshire Blvd., Suite 260
Los Angeles, CA 90025
Telephone (310) 806-3000
Facsimile (310) 826-4448
Daniel@asiaecon.org
Blackertesq@yahoo.com
lisa@asiaecon.org
lisa_borodkin@post.harvard.edu

Attorney for Plaintiffs,
Asia Economic Institute,
Raymond Mobrez, and
Iliana Llaneras

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIA ECONOMIC INSTITUTE, a California LLC; RAYMOND MOBREZ an individual; and ILIANA LLANERAS, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> XCENTRIC VENTURES, LLC, an Arizona LLC, d/b/a as BADBUSINESS BUREAU and/or BADBUSINESSBUREAU.COM and/or RIP OFF REPORT and/or RIPOFFREPORT.COM; BAD BUSINESS BUREAU, LLC, organized and existing under the laws of St. Kitts/Nevis, West Indies; EDWARD MAGEDSON an individual, and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 2:10-cv-01360-SVW-PJW <br><br> **DECLARATION OF ILIANA LLANERAS PURSUANT TO THE COURT'S ORDER ON APRIL 19, 2010 REGARDING PLAINTIFFS' RICO AND EXTORTION CAUSES OF ACTION** <br><br> Judge: Stephen V. Wilson <br> Trial Date: August 3, 2010 <br> Time: 9:00 AM <br> Courtroom: 6 |

I, Iliana Llaneras, declare under penalty of perjury as follows:

1.      My name is Iliana Llaneras. I am a resident of the State of California, and am over the age of 18, and if called to testify in court or other proceeding I could and would give the following testimony which is based on my own personal knowledge unless otherwise stated.

2.      I am a principal of Asia Economic Institute ("AEI"). AEI had been in business in California for the past nine years. At the time the defamatory posts were posted on Ripoff Report, AEI operated as a free on-line, non-governmental publication of current news and events.

3.      In early or mid-February of 2009, I and Mr. Mobrez conducted a search on Google.com ("Google") and/or Yahoo.com ("Yahoo") using the following terms: Raymond Mobrez, Mobrez, Iliana Llaneras, Llaneras, and AEI.  Within the first few search results, our names appeared in association with a "Ripoff Report." The resulting text also claimed that we had exploited our employees and warned search engine users not to work for AEI.

4.      I have never spoken with Ed Magedson. However, I witnessed the conversations that took place between Mr. Mobrez and Mr. Magedson on May 5th and 12th, 2009. Specifically, I listened in on the conversation from my office telephone.

5.      Mr. Mobrez's Declaration is a true and accurate rendition of the conversations that I witnessed between Mr. Mobrez and Mr. Magedson.

6.      Attached hereto as EXHIBIT A is a true and accurate copy of the handwritten notes I took during these conversations as they occurred.

7.      During these phone conversations, Mr. Magedson warned Mr. Mobrez against bringing legal action. Specifically, on May 5, 2009, at approximately 11:30 a.m., Mr. Magedson bragged about his legal team and warned Mr. Mobrez that he would "lose!"

8. Furthermore, I witnessed the conversation that took place on May 5, 2009 at approximately 1:00 p.m., during which Mr. Magedson requested $5,000 plus an additional monthly fee to enroll in what Mr. Magedson referred to as the "CAP." On May 12, 2009, Mr. Magedson described this "CAP" as the "negative goes away – see positive!"

9. To date, there are six reports regarding myself, Mr. Mobrez, and AEI on Mr. Magedson's Web site. At this time, we have not been able to hire any new employees. These false accusations have severely injured our reputations and halted each of our businesses.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED ON: May 3, 2010

Iliana Llaneras

Declaration of Iliana Llaneras - 3

**CERTIFICATE OF SERVICE**

I certify that on May 3, 2010 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David S. Gingras
**Gingras Law Office, PLLC**
4072 E. Mountain Vista Drive
Phoenix, AZ 85048
Attorney for Defendants

And a courtesy copy of the foregoing delivered to:
Honorable Stephen V. Wilson
U.S. District Judge

EXHIBIT A

5-5-09 ___ 11²⁷ am ___ 2 min
Rip no Right

Rip no sept

Either = 60 M. (Boss)

Read cap?

Yesp.

Filed Anonymous Statements

Legal team to fight
Don't try — will lose!
Class Action?

5/5/05   1 pm

Agen CP pymt?

⟹ Sure + math(?)
   ⟹ Send Hubns

Pty  1 time  —

Ripoff Report

5-12-09 2:45 pm

Ripoff

Not use Corp?

Ripoff Report

CDE

Greg Sucessful "Simple".

We Don't know names on postings.
but HE Does.

Yelled again "Like Crazy"
"Move on"

What for Fee?

We will see [illegible] from corp.
Nobody goes away - [illegible] positive!

→ Cont Stipulate to posting - Not true

Must agree & Sign Fill forms [illegible]
Meet to talk - lunch?

Parts & Pieces Wire → Option or
Dog Barking

Here

Wait — Front Door

Exhibit E

**GINGRAS LAW OFFICE, PLLC**

4072 E Mountain Vista, Phoenix, AZ 85048 • Tel: (480) 668-3623 • Fax: (480) 248-3196

May 11, 2010

VIA FACSIMILE: (310) 826-4448
& Email: lborodkin@gmail.com; blackertesq@yahoo.com

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
Asia Economic Institute
11766 Wilshire Blvd., Suite 260
Los Angeles, CA 90025

Re:    Asia Economic Institute, LLC, *et al.*, v. Xcentric Ventures, LLC, et al.,
       U.S. District Court, Central District of California Case No. 10-cv-01360

Lisa and Dan:

This letter is a follow-up to several discussions we have had relating to the events which transpired during the deposition of your client, Raymond Mobrez, on Friday, May 7, 2010.   As Dan knows (because he was there), and as Lisa knows (by virtue of my email to her on May 8, 2010), both of your clients have committed perjury in this case by manufacturing and presenting sworn false testimony accusing Mr. Magedson of demanding $5,000 in order to make negative information disappear from the Ripoff Report website, among other things.   The testimony given by both of your clients could not have been more material to the claims in this case.  Their false testimony literally constitutes the heart of their extortion/RICO claims.  The false testimony also bears on all of the other claims in the case insofar as your clients apparently were attempting to argue that the Communications Decency Act immunity should be denied to my clients because of these acts of extortion.

Based on these events, I am writing to explain my position on several issues and to demand that you provide me with your position on several issues.

## I.    SUMMARY OF XCENTRIC'S POSITION

Our position is very simple – your clients have lied under oath and have commenced and continued an action which they knew was factually groundless.  They clearly did this to maliciously harm Xcentric, harass Mr. Magedson, and to lend unjustified credibility to the lies of others who dislike the Ripoff Report's efforts to foster and promote free speech.

By their actions, your clients have violated Fed. R. Civ. P. 11 and they have exposed themselves to significant civil liability under Section 674 of the Restatement (Second) of

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
May 11, 2010
Page 2 of 8

Torts which Arizona applies as our common law.  Assuming the present federal case in Los Angeles is resolved in favor of Xcentric, a new lawsuit will immediately be filed against your clients in Arizona seeking to recover all damages caused by their illegal conduct.

## II.    OPTIONS FOR PROCEEDING

### a. Mandatory Withdrawal

As we have already discussed, these events give rise to serious ethical and legal concerns.  Among these are your duties to the State Bar of California and to the Court.  To be clear – while I am not threatening to report you to the bar or to make any reports of criminal conduct to law enforcement in order to gain any advantage in this case, at the same time I believe it is appropriate for me to stop and make note of your ethical and other obligations and to insist that you act lawfully in this case.

In that regard, I note that Rule 3–700 of the California Rules of Professional Conduct appears to make it mandatory for you to withdraw from this case immediately.  Specifically, the Rule states in pertinent part:

Rule 3-700. Termination of Employment

* * *

(B) Mandatory Withdrawal.

A member representing a client before a tribunal <u>shall withdraw from employment</u> with the permission of the tribunal, if required by its rules, and a member representing a client in other matters shall withdraw from employment, if:

(1)  The member knows or should know that the client is bringing an action, conducting a defense, asserting a position in litigation, or taking an appeal, without probable cause and for the purpose of harassing or maliciously injuring any person;

Clearly, at least with respect to the RICO/extortion allegations, you both know that your client has taken a position that is manifestly without probable cause and which serves no purpose other than to injure and harass Xcentric.  As I already stated, I understand that I cannot force to you comply with your ethical obligations, but I believe it is appropriate for me to remind you of what those obligations are and to demand that you comply with them.

Of course, the events of this case give rise to other serious ethical concerns, among these are California Rules of Professional Conduct: <u>3-200</u> (prohibiting a lawyer from bringing an action or asserting any position in litigation without probable cause and for the purpose of harassing or maliciously injuring any person); <u>3-210</u> (prohibiting a lawyer

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
May 11, 2010
<u>Page 3 of 8</u>

from advising a client to violate the law); and <u>5-200(B)</u> (prohibiting a lawyer from misleading a court by making a false statement of fact).  Furthermore significant case law exists for the principle that "an attorney should make a motion to withdraw from representation when the representation will result in a violation of law or rules of professional conduct."   *People v. Johnson*, 62 Cal.App.4[th] 608, 622, 72 Cal.Rptr.2d 805, 812 (4 DCA 1998) (citing Cal. Rules of Prof. Conduct, rule 3-700(B)(2), (C)(1)(b) & (c)); *People v. Brown*, 203 Cal.App.3d 1335, 1339–1340, footnote 1, 250 Cal.Rptr. 762 (1988) (same).

For these reasons, I would like you to inform me as soon as possible whether you intend to withdraw in this case.  Normally, this decision would not be exceptionally urgent.  However, because this case is set for trial on an expedited basis, and because Xcentric will need to take additional steps to protect itself from further harm in the event you refuse to withdraw, <u>I would like to request that you provide me with your position on this issue no later than Wednesday, May 12, 2010</u>.  If you do not bring a Motion to Withdraw by that date, I will assume that you have decided not to do so.

### b.  Continuation Of Case On Modified Factual Theory

Assuming that you do not withdraw, I believe that you may be exposing yourself to significant liability if you continue to rely on and pursue your clients' existing factual allegations regarding extortion/RICO knowing, as you now do, that those allegations are entirely false.   However, based on our conversation yesterday, I understand that you have indicated that your clients will be filing new declarations/affidavits which seek to "correct" their previous testimony.

It is unclear to me how these corrections would allow you to proceed with the extortion/RICO claims.  Your clients brought those claims based entirely on specific factual allegations that you now know are untrue.

However, it may be possible that you believe the case, or some part thereof, may still be salvageable based on the disclosure of new or different factual theories of some kind.  While I disagree this is even a possibility, if you intend to continue with this case on a *modified* and previously undisclosed theory, please let me know immediately, bearing in mind that the Court ordered your clients to disclose their factual theory as to the extortion claims no later than last Monday, May 3rd.  To the extent you attempt to assert any new or different factual theories, this plainly violates the Court's order and I will object to any modified theory on that basis.

Furthermore, the deposition confirmed and in some cases revealed serious deficiencies in your evidence related to essential elements of the claims brought.  It is exceedingly clear that your client can not satisfy the elements of extortion or RICO including a lack of damages and a lack of causation.  The remaining claims are barred by the CDA, so the entire case has no possible hope of succeeding.

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
May 11, 2010
Page 4 of 8

### c. General Settlement Points

As Maria and I explained to you on the phone, Xcentric has successfully sued parties and their lawyers for knowingly commencing and continuing litigation that they knew was factually groundless.   Xcentric intends to bring such claims against your clients for their wrongful actions and we will not hesitate to include claims against either or both of you individually if you continue to prosecute any claims in this case which you know are factually untrue or if the evidence demonstrates that you brought this case knowing that the allegations contained in it were factually untrue.

That fact notwithstanding, although the settlement window will be closing very soon, this case is actually in a good posture to be resolved without years of additional litigation. That is so because at present, Xcentric's attorney's fees and costs are relatively low (probably less than $25,000), and based on my discussions with Mr. Mobrez during his deposition, we believe it is likely that he has information that may be of substantial value to Xcentric.  In a nutshell, I think our clients may be in a position where they can each receive something of value from an immediate resolution of this case.

Thus, as Maria explained to you on the phone, we may be willing to agree to a settlement of this case based on several simple points.

The first point is that your clients would need to retract their prior testimony and admit that they were never asked for money, etc., and immediately agree to the dismissal of their lawsuit with prejudice.

The second point is that your clients would agree to pay all of the attorney's fees and costs incurred by Xcentric to date which we believe are probably less than $25,000 (though this number is increasing with each passing day).

The third point is that your clients would provide a full, complete, and truthful explanation of each and every third party who aided, solicited, and/or encouraged them to make their false extortion claims in this case.   Ultimately, even though Xcentric has suffered damage as a result of your clients' actions, we have a larger goal of ferreting out and stopping third parties who have helped or directed this type of fraudulent litigation.   As such, Xcentric may be willing to reduce or even completely waive the amount of damages and fees your clients would have to pay depending upon how useful the information they are willing to provide is.  Of course, further false testimony is of no interest to us, so we would only be willing to discuss this option in the event your clients can provide solid, verifiable evidence (preferably in the form of documents) which show what role was played by any third parties in the initiation of this case.   Again, the opportunity to discuss settlement on these terms presumes that your clients will immediately end this case and immediately stop causing Xcentric to incur additional fees, so each day that passes makes this proposal less likely to be acceptable to Xcentric.

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
May 11, 2010
Page 5 of 8

### III.   RESPONSE TO SPECIFIC POINTS

Having stated Xcentric's general position, I also wanted to respond to some of the specific comments/remarks made in Lisa's email to me from this past Sunday.

### a. CRPC 5–100

Lisa noted that some of my prior comments referred to your clients' criminal actions and to my decision to contact the State Bar of California.  Lisa cited California Rule of Professional Conduct 5-100 which provides, in part, "A member shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."

To be clear—at no time in the past have I threatened anyone with criminal or administrative charges of any kind, nor should this letter be construed as such a threat. Obviously, because this case contained allegations of extortion, I am well-aware that it would be patently illegal and unethical for me to state or imply that I would report your clients' criminal actions to any law enforcement agency, or your actions to the State Bar of California in order to gain any advantage in this case.

So that there is no misunderstanding, I want to offer some explanation of the actions I have taken along with my reasons for taking such action.  Under Arizona's ethical rules (specifically, ER 8.3(a) of the Arizona Rules of Professional Conduct), it is <u>mandatory</u> for a member of the bar to report any conduct by another lawyer which "raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects … ."  The failure to report another attorney is, itself, an ethical violation under Arizona's rules.

Because I did not know that your clients had perjured themselves until I received their declarations on Monday, May 3, because I did not know (and still do not know) what involvement, if any, you may have had, and because I did not know whether California imposed a similar duty to report ethical violations by another attorney, I contacted the State Bar of California ethics hotline on Tuesday, May 4th, to ask for their guidance in this situation.  I did not tell them your names nor did I tell them anything else about this case.  I simply inquired about the nature and extent of my duties and obligations upon learning that the opposing party in a civil case had committed perjury.

The person I spoke to at the bar informed me that unlike Arizona, California does not require lawyers to report such events, but she also indicated that reporting any misconduct that may occur is strongly encouraged.  Of course, as I have already explained to Dan, my assumption thus far has been that both of you have been unaware of the truth.  If true, then you would not have engaged in any unlawful or unethical conduct – at least up until the point where you became aware that your clients had lied under oath.  From that point forward, the situation changes because now that you know the truth, you could face serious consequences if you continue representing your clients in this matter.

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
May 11, 2010
Page 6 of 8

However, please note that I have never threatened to accuse anyone of a crime or to report any actions of anyone to the State Bar, whether to gain a tactical advantage or otherwise.  Instead, because my clients are plainly victims of your clients' criminal actions, I am merely demanding that both you and your clients follow all applicable laws and ethical obligations.

### b.  Timing & Admissibility of Recordings

As to the issue of timing, obviously the recordings are rebuttal evidence used solely to impeach your clients' testimony.  Under Rule 26(a), it is not necessary for any party to automatically disclose this type of evidence, so that's why I did not disclose them to you as part of our original disclosures.  I did not intend to suppress evidence, trick you, or withhold anything from you – I simply did not know that the recordings were going to be necessary until your clients claimed that the extortionate acts took place during these calls (Mr. Mobrez could just as easily have claimed they took place in writing, in person, or in some other manner other than by phone).

Furthermore, as you certainly know, the first time that I learned about your clients' specific factual allegations was in their declarations that you filed with the court on Monday, May 3, 2010.  Before those declarations, your clients only made generalized allegations as to when/where/how they had been extorted, so until they both accused Mr. Magedson of demanding money over the phone on specific dates, I had no idea whether or not the recordings were going to be necessary at all.  As soon as it became clear to me that the recordings were needed, I disclosed them to you, albeit only after asking Mr. Mobrez to confirm the story as contained in these declarations (which I felt I was required to do in order to protect my clients and to prevent Mr. Mobrez from changing his story again).

In addition, and to respond to another of Lisa's questions, until I actually saw your clients' declarations, I did not know whether the recordings were admissible.  This is so because although the recordings were made in Arizona, and although Arizona does <u>not</u> require the consent of both parties in order to record a telephone call, the law in California is different.   Under Cal. Pen. Code § 623(a), calls recorded without the consent of both parties *may* be inadmissible in a party's case-in-chief if the communication was "confidential".   Under § 623(c), the term "confidential" does not include any calls where the speaker knows or reasonably expects he is being recorded, nor does it apply to "any other circumstance in which the parties to the communication may reasonably expect that the communication may be <u>overheard</u> or recorded."

Until I saw your clients' declarations, I did not know that Ms. Llaneras was listening in to any of the calls.  Of course, because Mr. Mobrez knew that she was eavesdropping (which, by itself, may have violated the law), Ms. Llaneras was kind enough to render these recordings admissible because Mr. Mobrez could not have expected that his conversations with Mr. Magedson were confidential when he knew they were being overhead by Ms. Llaneras.

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
May 11, 2010
Page 7 of 8

Although I believe there are three calls that Ms. Llaneras did not eavesdrop upon (Call #1, #3, and #6 according to my list) I am confident the court would find the recording of every call to be admissible.  This is so because two of these calls were <u>voicemails</u> left by Mr. Mobrez (Call #3 on April 27 and Call #6 on May 6).  Obviously, a person who leaves a voicemail knows that the call is being recorded, so the eavesdropping statute would not apply at all.

This leaves only Call #1 on April 27.  Even assuming *arguendo* that Mr. Mobrez could have reasonably expected that this call was not being recorded, that point is irrelevant because the exclusionary evidentiary sanction of Penal Code § 632 is not a "shield for perjury" and therefore recordings made in violation of that section can still be used for impeachment of any witness who takes the stand and lies.  *See Frio v. Superior Court*, 203 Cal.App.3d 1480, 1497, 250 Cal.Rptr. 819, 829 (2 DCA 1988) (explaining, "the evidentiary sanction of section 632, subdivision (d), <u>cannot be construed so as to confer upon a testifying witness the right to commit perjury</u>.")

What this means is simple – if Mr. Mobrez testifies falsely about the contents of Call #1 (as he has already done) the recording of that call can be used for impeachment.  Of course, if Mr. Mobrez chooses to testify truthfully about this call and every other call, then the recording of Call #1 is would be unnecessary.

### c.  Authenticity of Recordings

As for the authenticity of the recordings, Mr. Mobrez admitted the voice on the tape was his, so I do not think this is an issue.  In terms of whether the recordings are genuine and complete, I have a couple of comments.

First, the recordings were <u>NOT</u> made by Mr. Magedson.  Rather, they were created by a third-party vendor to Xcentric who recorded the calls and then emailed the audio recordings to Mr. Magedson in the usual course of business.  These calls are business records of Xcentric and the original emails from the vendor are kept in the regular course of our business.  I also have the original emails with the original audio files attached to them (these vary from the ones I gave you only with respect to the file names which were changed for ease of reference and some of the meta data in the file header which was redacted in order to protect the name of the vendor until such time as a protective order can be entered).

Second, if you wish, I am certainly happy to expend additional fees allowing you to investigate and confirm the authenticity of the recordings.  As I already stated, absent a prompt settlement, your clients will be bearing all costs and fees incurred by Xcentric, so any costs we incur will ultimately be their responsibility.  Even assuming the vendor does not maintain copies of these recordings beyond a certain date (which I have not yet been able to confirm), I am confident that an expert could review the files and the process by which they were emailed to Mr. Magedson and confirm that tampering with them would have been impossible.

Ms. Lisa J. Borodkin, Esq.
Mr. Daniel F. Blackert, Esq.
May 11, 2010
Page 8 of 8

Third, you should note that in many ways, your client's own speech on the recordings confirm that they are an accurate version of the discussions between Mr. Magedson and Mr. Mobrez.   For instance, on the final recording (#7 made on May 12), Mr. Mobrez tells Mr. Magedson that he still does not know what the cost of the CAP program is.   Of course, this is entirely consistent with the rest of the recordings because Mr. Magedson never told him what the cost was and never asked for any money of any kind.  Similarly, in the recording of Call #6 (a voicemail call made from Mr. Mobrez's cell phone), Mr. Mobrez's message states that he has been talking to someone at Xcentric who "keeps hanging up and doesn't seem to want to stay on the phone…."  This is completely consistent with what the previous calls show.

As such, while you might think it is prudent to take the position that there could be a small chance that the recordings have been altered, I want you understand that the consequences of taking that position could be substantial—because the facts clearly show that your clients have lied in virtually every material respect, continuing to represent them will make you jointly and severally liable for their actions.   Thus, assuming the recordings have not been altered (which is obvious under the facts here), then travelling down that road in the vain hope of finding support for claims which you know to be false will not result in any reduction of your liability.   In order for counsel to become personally liable for the tort of wrongful use of civil proceedings, all that is required is to show that they commenced or continued a case or claim after learning that the claim lacked "probable cause"; "one who continues a civil proceeding that has properly been begun or one who takes an active part in its continuation for an improper purpose after he has learned that there is no probable cause for the proceeding becomes liable as if he had then initiated the proceeding."  Restatement (Second) of Torts § 674, comment 'c'.  Hoping against hope that you might find probable cause in the face of such overwhelming evidence does not mean that you will do so, and if you do not do so, then you will be exposed to complete liability for continuing this case without probable cause.

## IV.    SUMMARY

In closing, I want to emphasize one obvious fact—your clients have lied about the material facts of this case.   As such, just as your clients were, you now stand at a crossroads wherein you have a choice: you can do the right thing and follow the requirements set forth by the law and by your ethical duties, or your can ignore those duties and face the consequences.   Although your clients have clearly made the wrong choice, I hope that you display more wisdom and that you decide to make the right choice while it still remains available to you.

**VERY TRULY YOURS,**

David Gingras

Exhibit F

1  DANIEL F. BLACKERT, ESQ., CSB No. 255021
2  LISA J. BORODKIN, ESQ. CSB No. 196412
   **Asia Economic Institute**
3  11766 Wilshire Blvd., Suite 260
   Los Angeles, CA 90025
4  Telephone (310) 806-3000
   Facsimile (310) 826-4448
5  Daniel@asiaecon.org
   Blackertesq@yahoo.com
6  lisa@asiaecon.org
   lisa_borodkin@post.harvard.edu
7
   Attorney for Plaintiffs,
8  Asia Economic Institute, LLC,
   Raymond Mobrez, and
9  Iliana Llaneras

10            **UNITED STATES DISTRICT COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA**

12  ASIA ECONOMIC INSTITUTE, a          ) Case No.: 2:10-cv-01360-SVW-PJW
    California LLC; RAYMOND              )
13  MOBREZ an individual; and ILIANA    ) **CORRECTED AFFIDAVIT OF**
14  LLANERAS, an individual,            ) **RAYMOND MOBREZ PURSUANT**
                                        ) **TO THE COURT'S ORDER ON**
15            Plaintiffs,               ) **APRIL 19, 2010 REGARDING**
                                        ) **PLAINTIFFS' RICO AND**
16       vs.                            ) **EXTORTION CAUSES OF ACTION**
17  XCENTRIC VENTURES, LLC, an          )
    Arizona LLC, d/b/a as BADBUSINESS   )
18  BUREAU and/or                       )
    BADBUSINESSBUREAU.COM               )
19  and/or RIP OFF REPORT and/or        )
    RIPOFFREPORT.COM; BAD               )
20  BUSINESS BUREAU, LLC, organized     )
    and existing under the laws of St.  )
21  Kitts/Nevis, West Indies; EDWARD    )
22  MAGEDSON an individual, and DOES    )
    1 through 100, inclusive,           )
23                                      )
              Defendants.
24  ─────────────────────────────────

25
26
27
28

                    Declaration of Raymond Mobrez - 1

I, Raymond Mobrez, declare under penalty of perjury as follows:

1.     My name is Raymond Mobrez.  I am a resident of the State of California, am over the age of 18 years, and if called to testify in court or other proceeding I could and would give the following testimony which is based on my own personal knowledge unless otherwise stated.

2.     I make this declaration to correct the record in this case and my prior declaration made and filed on May 3, 2010. I filed that Declaration pursuant to the Court's April 19, 2010 Order.  I have since learned that at the time I filed my May 3, 2010 Declaration, I was mistaken as to the substance of the six phone conversations between myself and Mr. Magedson on April 27, 2009, May 5, 2009, and May 12, 2009 described my May 3, 2010 declaration.  There were  a number of calls madeby me to Ripoff Report.   In addition, there were a number of incoming calls to me from Ripoff Report..  However, I make this Declaration to correct any inaccurate testimony that I mistakenly provided.

3.     After reviewing certain documents that were in Defendants' sole control at the time of my prior declaration, my recollection of these events has been refreshed.

4.     I now realize that the prior declaration I made was mistaken in some of the details of the times of the calls. I had also confused some of what was said in my telephone conversations with what was written in the e-mail correspondence

between myself and Mr. Magedson. Specifically, in the telephone calls, Mr. Magedson referred to his emails, and Mr. Magedson's emails contain a link to a portion of the RipoffReport.com website that describes in more detail the Defendants' Corporate Advocacy Program. On Defendants' website the CAP is described, including fees associated with it. I now realize that the statement that the charges are based on the size of the company may not have been in a telephone call, but in a portion of the RipoffReport.com website to which Mr. Magedson's email of May 12, 2010 refers. Attached hereto as Exhibit M is a true and correct printout from the web address http://www.ripoffreport.com/CorporateAdvocacyHowItWorks.aspx as it appeared on May 13, 2010. To the best of my recollection, that portion of the website provided the same information in and about May 2010 as contained in Exhibit M.

5. I do specifically recall a telephone conversation with someone who mentioned "five grand" as the cost for joining the Corporate Advocacy Program. I do not remember the exact time or date of the call. I believe it was to or from me. I do not know whether the speaker was Ed Magedson or not. I do remember that this person was a fast talker

6. I sincerely apologize to this Honorable Court, Defendants and counsel for my confusion and lapse in judgment in attempting to reconstruct my conversations with Ripoff Report from the office phone records I had. Exhibit L to

my prior declaration were not notes taken at the time, but notes of my confused efforts to reconstruct the exact details of the calls, based on a combination of imperfect memory, documents I located at the time, and erroneous assumptions drawn from Mr. Magedson's prior declarations.

7.    I also wish to correct the statement in paragraph 5 of my prior declaration that "rebuttals" do not appear as results on Internet search engines such as Google and Yahoo. It is more accurate to say that in my previous searches, my "rebuttal" for the Asia Economic Institute sometimes appears and sometimes does not appear among the search results.

8. Aside from the above, my declaration of May 3, 2010 is true.

**Pursuant to 28 U.S.C., Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

EXECUTED ON: May 20, 2010.

_____
Raymond Mobrez

Declaration of Raymond Mobrez - 4

EXHIBIT M

...by consumers, for consumers ...scams, consumer complaints, and frauds reported. File a report, post your review or experience!

 **Ripoff Report**

Don't let them get away with it.® Let the truth be known!            **HOME**

 

SEARCH COMPANY OR REPORT #
[                    ] Search
Use Advanced Search  Latest Reports



Our Program

How It Works

Benefits of Joining

What Customers Say

Application To See If You
Qualify

# Corporate Advocacy Program

## How It Works:

If you've had a negative complaint filed about your company on the Internet, help is just a click away. Ripoff Report's Corporate Advocacy Program is

*Turn negative customer service experiences into positive opportunities for your business.*

a Web-based program that helps you put a restitution plan in place to right customer wrongs, turn bad buyer experiences into good customer service, and prove to your customers that your business is committed to their satisfaction.

Businesses of all sizes have customer complaints and can benefit from Ripoff Report's Corporate Advocacy Program, from sole proprietorships to large multinational corporations.

## Ripoff Report's Corporate Advocacy Program...

1. Verifies all reports and rebuttals, determines the truthfulness of the complaints and exposes those posted erroneously or maliciously.
2. Sends a positive letter that we draft together to each person who posted a report about your company, notifying them your firm has offered to negotiate in good faith to resolve their complaint.
3. Updates all reports with your commitment to right customer wrongs.
4. Gives you, our member business, the opportunity to provide your side of the story and link to your own website, where you may post your commitment.

When you demonstrate your commitment to improving the relationships you have with your customers, you build goodwill inside and outside the company. If you heard a company say, "We are glad this came to our attention, and we want unhappy customers to contact us because we're committed to 100% customer satisfaction, *and* we're taking actions that will ensure this never happens again," you'd think well of the company, and so would its prospective customers.

Few are able to admit their involvement in any wrongdoing. Few are willing to go so far in pleasing their customers. Not everyone is up to the task. Are you?

Take responsibility for your business and your customers by becoming a member today.

Note on Qualification:
- Fees for enrolling in the program are based upon the number of Reports filed, the number of offices you have, and/or the size of an average sale. Additionally, there is a flat set-up fee to offset the costs associated with programming and contract legalities. Rate sheets will be sent upon completion and verification of the intake questionnaire.
- If participation in this program would honestly create a financial hardship, but you desire to participate, we will work with you to find a way to make it work. This may require providing financial documents proving hardship.

Read why consumers want to do business with a member





Bet you can't get it right!
96.7% get this question wrong



of the Corporate Advocacy Program.

**Ripoff Report**

Home    File a Report    Consumer Resources    Search    Link to Ripoff Report

Privacy Policy    Terms of Service    FAQ    About Us    Contact Us    Why Ripoff Report will not release author information!

Thank You Emails!    Corporate Advocacy Program: How to repair your business reputation.    Ed Magedson - Ripoff Report Founder

Want to sue Ripoff Report?    Donate to our Legal Defense

Copyright © 1998-2010, Ripoff Report. All rights reserved.

5/13/2010 3:14 PM

Exhibit G

1  DANIEL F. BLACKERT, ESQ., CSB No. 255021
2  LISA J. BORODKIN, ESQ. CSB No. 196412
   **Asia Economic Institute LLC**
3  11766 Wilshire Blvd., Suite 260
   Los Angeles, CA 90025
4  Telephone (310) 806-3000
   Facsimile (310) 826-4448
5  Daniel@asiaecon.org
   Blackertesq@yahoo.com
6  lisa@asiaecon.org
   lisa_borodkin@post.harvard.edu
7  Attorney for Plaintiffs,
8  Asia Economic Institute,
   Raymond Mobrez, and
   Iliana Llaneras
9

10            **UNITED STATES DISTRICT COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA**

12  ASIA ECONOMIC INSTITUTE, a          ) Case No.: 2:10-cv-01360-SVW-PJW
    California LLC; RAYMOND             )
13  MOBREZ an individual; and ILIANA    ) **CORRECTED AFFIDAVIT OF**
    LLANERAS, an individual,            ) **ILIANA LLANERAS PURSUANT**
14                                      ) **TO THE COURT'S ORDER ON**
                                        ) **APRIL 19, 2010 REGARDING**
15            Plaintiffs,               ) **PLAINTIFFS' RICO AND**
                                        ) **EXTORTION CAUSES OF ACTION**
16       vs.                            )
                                        )
17  XCENTRIC VENTURES, LLC, an          )
    Arizona LLC, d/b/a as BADBUSINESS   )
18  BUREAU and/or                       )
    BADBUSINESSBUREAU.COM               )
19  and/or RIP OFF REPORT and/or        )
    RIPOFFREPORT.COM; BAD               )
20  BUSINESS BUREAU, LLC, organized     )
    and existing under the laws of St.  )
21  Kitts/Nevis, West Indies; EDWARD    )
    MAGEDSON an individual, and DOES    )
22  1 through 100, inclusive,           )
                                        )
23            Defendants.               )
    _____
24

25

26

27

28

                  Declaration of Iliana Llaneras - 1

I, Iliana Llaneras, declare under penalty of perjury as follows:

1.      My name is Iliana Llaneras. I am a resident of the State of California, and am over the age of 18, and if called to testify in court or other proceeding I could and would give the following testimony which is based on my own personal knowledge unless otherwise stated.

2.      I make this declaration to correct the record in this case and my prior declaration made and filed on May 3, 2010. I have since learned that at the time I filed my May 3, 2010 Declaration, I was mistaken as to the substance of the telephone conversations that I described overhearing therein.

3.      After reviewing documents that were previously solely in the possession of Defendants, I now believe that the descriptions of the telephone conversations in my May 3, 2010 declaration were not accurate.  I had also confused some of what I overheard with some of what I had read in emails.  I was also somewhat confused in my memory and had drawn some erroneous assumptions about what might have been discussed between Ed Magedson and my husband based on reviewing Mr. Magedson's prior declarations filed with this Court.

4.      I do specifically recall overhearing a telephone conversation in which money was discussed. I do not recall what day it was. I was returning to the office when Mr. Mobrez instructed me to pick up the phone by using hand signals.  I then

proceeded to my office and began listening to the conversation from another line. I immediately identified Mr. Mobrez's voice. I was unable to recognize the voice on the other end of the telephone line. I do not know whether the other man on the call was Ed Magedson, or from the Ripoff Report or otherwise. The two men were discussing money as I listened to the call. I only listened for a short period of time.

5.    I sincerely apologize to this Honorable Court, Defendants and counsel for my confusion and lapse in judgment in attempting to reconstruct my memories of the times and dates of what I heard. I did overhear such calls, but Exhibit A to my prior declaration were not notes taken at the time, but notes of my confused efforts to reconstruct the exact details of the calls. This was based on a combination of imperfect memory, documents I located at the time, and erroneous assumptions drawn from Mr. Magedson's prior declarations, and I sincerely apologize for the error.

**Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

EXECUTED ON: May 20, 2010

Iliana Llaneras

Exhibit H

FILED
CLERK, U.S. DISTRICT COURT

JUN 1 5 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIA ECONOMIC INSTITUTE, LLC, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>XCENTRIC VENTURES, LLC, *et al.*,<br><br>Defendants. | Case No: 2:10-cv-01360-SVW-PJW<br><br>[PROPOSED]<br>FINAL JUDGMENT |

Priority ———
Send ———
Enter ———
Closed ———
JS-5/JS-6 ———
JS-2/JS-3 ———
Scan Only ———

Pursuant to the Court's July 19, 2010 and May 4, 2011 Orders granting Defendant's Motion for Summary Judgment, it is hereby ORDERED, ADJUDGED, AND DECREED that summary judgment is granted in favor of Defendants XCENTRIC VENTURES, LLC and EDWARD MAGEDSON ("Defendants") and against Plaintiffs ASIA ECONOMIC INSTITUTE, LLC, RAYMOND MOBREZ, and ILIANA LLANERAS ("Plaintiffs") as to all claims and relief requested by Plaintiffs, and Plaintiffs are ordered to take nothing thereby.

Furthermore, for the reasons stated in the Court's May 4, 2011 Order, it is further ORDERED, ADJUDGED, AND DECREED that the following motions are DENIED: Defendants' Motion for Sanctions [Doc. #s 157, 158], Defendants' Special Motion to Strike [Doc. #154] and Plaintiff's Rule 56(f) Motion [Doc. #173].

The Clerk is ordered to enter this Judgment.

IT IS SO ORDERED.

DATED: 6/13/11

_____
HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

**[PROPOSED] FINAL JUDGMENT**

Exhibit I

**David Gingras**

---

**From:**     daniel F. Blackert, esq. [blackertesq@yahoo.com]
**Sent:**     Friday, May 07, 2010 10:26 PM
**To:**        david@ripoffreport.com
**Subject:** Re: AEI et al. v. Xcentric (C.D. Cal. 10-cv-1360) Draft Rule 26f Report

David,

In light of todays events I believe I have a serious conflict of interest between myself and my client. I
will do whatever state bar mandates. I have called today but they do not resume until monday. In light if
todays developments which were contradictory to anything I have heard, seen, or discussed w my
clients. I will act in accordance w my ethical obligations 100 percent. You have to realize this is a shock
to me. Per my own indepedent research I need to withdraw from the case and explain why. In light of
todays events I have a serious conflict of interest and will withdraw as counsel. In addition I explained
to my clients the implications of todays events and that I can no longer represent them per ethical
obligations and will explain to the court why in a dec. My only concern is still seeking correct anaccurae
advice from the state bar and acting accordingly. Moreover, I urged my client to dismiss this case. I need
to review the ethical rules in more detail and talk w the ethics hotline. As lead counsel, I believe in good
faith,sadly, that I can no longer move this case forward and do not intend to do so. I am taking this very
seriously and am completely shocked.

Daniel

Sent from my Verizon Wireless BlackBerry