1  **WO**

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8   Xcentric   Ventures,   L.L.C.,   an   Arizona        No. CV-11-01426-PHX-GMS
    limited liability company,
9                                                        **ORDER**
                        Plaintiff,
10
11  vs.

12  Lisa Jean Borodkin, et al.,

13  _____
    Raymond Mobrez,
14
                        Counterclaimant,
15  vs.

16  Xcentric   Ventures,   L.L.C.;   and   Edward
    Magedson,
17
                        Counterdefendants.
18

19          Pending before the Court are two Motions. Defendants Raymond Mobrez and

20  Iliana Llaneras (the "AEI Plaintiffs") have filed a Motion for Summary Judgment. (Doc.

21  184.) That Motion is granted. Plaintiff Xcentric Ventures, LLC had filed a Motion for

22  Reconsideration of several of the Court's discovery and scheduling orders. (Doc. 217.) In

23  light of the grant of summary judgment for the AEI Plaintiffs, that Motion is now moot.

24                          **FACTUAL BACKGROUND**

25          Plaintiff Xcentric Ventures, LLC is an Arizona company that operates the website

26  www.ripoffreport.com ("Ripoff Report"). As its name suggests, Ripoff Report is an

27  online forum where users can read and post messages about businesses that purportedly

28

have "ripped off" consumers in some manner. (Doc. 199-2 ¶ 2.) Xcentric claims never to have removed a post, which allows its users to post anything about anyone. Edward Magedson is the manager of Xcentric and the editor of Ripoff Report. (Doc. 199-2 ¶ 2.) Defendants Raymond Mobrez and Iliana Llaneras were the principals of Defendant Asia Economic Institute, LLC ("AEI"), a now-defunct California company that published current news and events online from the year 2000 until June 2009. (Doc. 187 ¶ 3.) In 2009, several Ripoff Reports appeared that made various accusations against the AEI Plaintiffs.

## I.     THE 2010 LAWSUIT

On January 27, 2010, the AEI Plaintiffs brought an action against Xcentric in California (the "California Action"). (Doc. 55, Ex. A.) The California Complaint alleged RICO racketeering claims against Xcentric predicated on attempted extortion.[1] (*Id.* ¶¶ 62–64.) The AEI Plaintiffs allegedly contacted Xcentric after the Ripoff Reports appeared on the website and learned that Xcentric "would not remove the defamatory posts even if they were false." (*Id.* ¶ 30.) Xcentric informed the AEI Plaintiffs that they could file a free rebuttal or, if they remained unsatisfied, join the Corporate Advocacy Program ("CAP"). (*Id.* ¶¶ 16, 20, 30.)

According to Xcentric, an individual or entity that enters the CAP has to pay a fee and commit "to work with Ripoff Report and the unhappy customers who have filed reports in order to resolve their complaints. This must include offering full refunds if requested by the customer." (Doc. 199-2, Ex. B (Magedson Decl. 3) ¶ 10; Doc. 199-2 (Magedson Decl. 1) ¶ 18.) In return, Ripoff Report "acts as a liaison between the CAP member and its customers by contacting each author who has submitted a report to our site about the company", and appends various tags and notes to the already-published Ripoff Reports to show that the subject of the Reports has begun to mend its ways. (*Id.*,

---

[1] Other claims were present in the California Action, but the Court has already dismissed this malicious prosecution action as to the AEI Plaintiffs' pursuit of those claims. (Doc. 213.) The litigation of the extortion claim is the only basis for malicious prosecution that remains.

1    Ex. B (Magedson Decl. 3) ¶¶ 10–12.)

2           According to the California Complaint, after Xcentric informed the AEI Plaintiffs

3    that CAP membership required an admission of guilt, Xcentric, through an exchange of

4    phone calls and emails with Magedson, "further informed Mobrez that it would not do

5    anything about the posts until it was paid a fee of approximately five thousand dollars

6    ($5,000), plus additional monthly monitoring fees." (Doc. 55, Ex. A ¶¶ 33, 62.) To the

7    AEI Plaintiffs, "[t]he implication was clear that for a fee, Defendants would correct the

8    content of the posts." (*Id.* ¶ 34.) They arrived at this conclusion because Magedson told

9    them in an email that "[t]his program changes the negative listings on search engines into

10   a positive along with all the Reports on Rip-off Report." (*Id.* ¶ 31.) The AEI Plaintiffs

11   asserted that Xcentric's "program amounts to attempted extortion . . . . Additionally, the

12   electronic and telephonic communication between Mobrez and Magedson constitute[d]

13   several predicate acts sufficient to establish a 'pattern of racketeering activity' as that

14   term is defined in [the applicable statute]." (*Id.* ¶¶ 63–64.)

15          The California District Court bifurcated the case to consider the extortion claim[2]

16   first and ordered the AEI Plaintiffs to produce "a declaration describing meetings with

17   any representative of defendant regarding extortion[ ]." (*Id.*, Ex. B.) On May 3, 2010,

18   Mobrez filed an affidavit with the California District Court. (*Id.*, Ex. C.) He stated that he

19   communicated with Magedson several times by telephone and email during April and

20   May of 2009. (*Id.* ¶¶ 6–14.) During those conversations, Mobrez objected to the Reports

21   and asked Magedson to remove them, but Magedson refused, claiming Xcentric never

22   removes a post. (*Id.*) Instead, he directed Mobrez to join the CAP. (*Id.* ¶¶ 6–10.) He also

23   warned Mobrez that the lawsuits were futile. (*Id.* ¶ 10.) In a subsequent phone call,

24   Mobrez asked Magedson how much enrollment in the CAP would cost, and Magedson

25   informed him that "it would cost . . . at least 'five grand' plus a monthly maintenance fee

26   of a couple hundred dollars. He stated that these charges were based on the size [o]f the

27   _____

28          [2] The references to "extortion claims" throughout this Order are references to the
     RICO claim predicated on attempted extortion.

company. Specifically, he stated that the more money a company made, the more they would be charged." (*Id.* ¶¶ 11–13.) Magedson refused to do anything until Mobrez agreed to enroll in the CAP. "When asked what we would receive if we paid the fees he demanded, Mr. Magedson claimed that 'all the negative goes away and you see the positive.'" (*Id.* ¶ 14.) Mobrez attached to his declaration "true and accurate copies of hand written notes taken by me during my telephone conversations with Mr. Magedson." (*Id.* ¶ 19.)

Llaneras listened in on the conversations between Mobrez and Magedson and affirmed in her declaration that the conversations occurred as Mobrez described. (*Id.*, Ex. D.) She attached to her declaration "handwritten notes I took during the conversations as they occurred." (*Id.* ¶ 6; *id.* "Ex. A".) She confirmed that during the conversation of May 5, 2009, "Mr. Magedson requested $5,000 plus an additional monthly fee to enroll in what Mr. Magedson referred to as the 'CAP.' On May 12, 2009, Mr. Magedson described this 'CAP' as the 'negative goes away—see positive!'" (*Id.* ¶ 8.)

At his deposition, Mobrez reaffirmed the statements about his conversations with Magedson. (Doc. 55 ¶¶ 39–42; *Id.*, Ex. E at 1.) Xcentric's counsel then disclosed to Mobrez and Llaneras that all phone conversations between Magedson and Mobrez had been recorded and that the recording flatly contradicted the statements made in their affidavits that Magedson quoted a price for the CAP. (*Id.*) In fact, Magedson made almost none of the comments attributed to him in the AEI Plaintiffs' Declarations. (Doc. 199-2 (Magedson Decl. 1) ¶ 5.) The phone conversations were brief and Magedson made only generic references to the website's information on CAP. (*Id.* ¶¶ 6–19) Magedson also sent a form email describing the basic contours of the program. (*Id.* ¶¶ 5–9.) The cost of enrolling in the CAP did not appear on the website because, according to Magedson, there is no set cost—it fluctuates based on the individual situation. (*Id.* ¶ 18.)

On May 20, 2010, Mobrez and Llaneras filed "corrected" affidavits. (Doc. 55, Exs. F, G.) These new affidavits did not describe any telephone conversations where Magedson threatened AEI or asked for money. (*Id.*, Ex. F.) Mobrez substantially recanted

1   all of the relevant details of the previous declaration, save two: he maintained that
2   someone at Xcentric told him it would cost "five grand" to join the CAP, and added that
3   he received several calls from Xcentric. (*Id.* ¶¶ 2–5.) Xcentric disputes these points.
4   Mobrez blamed a mix-up between telephone and email conversations for the "inaccurate"
5   statements in his prior declaration. (*Id.* ¶ 6.) Mobrez also admitted that the exhibit
6   attached to his prior declaration was not a copy of the notes he took contemporaneously,
7   but "notes of my confused efforts to reconstruct the exact details of the calls, based on a
8   combination of imperfect memory, documents I located at the time, and erroneous
9   assumptions drawn from Mr. Magedson's prior declarations." (*Id.* ¶ 6.) Llaneras followed
10  suit and admitted that the substance of the telephone conversations was not what had
11  been previously stated and likewise claimed she mixed up emails. (*Id.*, Ex. G.) She
12  likewise admitted her "handwritten notes [she] took during the conversations as they
13  occurred" were actually written much later. (*Id.*)

14          Xcentric subsequently moved for summary judgment on the RICO extortion
15  claims. That motion was granted on July 19, 2010. At that point, the AEI Plaintiffs were
16  "not relying on the substance of the phone calls to support their claims that Defendants
17  engaged in attempted extortion. Instead, Plaintiffs appear to rely solely on the emails
18  Magedson sent to Mobrez and the content on Defendants' website." *Asia Econ. Inst. v.*
19  *Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX, 2010 WL 4977054 at *14 n.14 (C.D.
20  Cal. July 19, 2010). After extensively reviewing the evidence submitted by both parties,[3]

21  ─────────────────────────

22          [T]he only evidence that the Court can consider regarding the
        communications between Plaintiffs and Defendants that are relevant to
23      Plaintiffs' extortion claim are: (1) the emails between the parties; (2) the
        limited information contained in the Mobrez and Llaneras corrected
24      declarations filed on May 20, 2010-that is, information about the emails
        and about the call regarding "five grand;" and (3) Magedson's testimony
25      regarding the substance of his calls with Mobrez, which is not refuted by
        Plaintiffs' corrected declarations. For the reasons stated below, the Court
26      finds that this evidence, even construing all reasonable inferences in
        support of Plaintiffs, fails to demonstrate a triable issue on Plaintiffs' RICO
27      claims.

28  *Asia Econ. Inst. v. Xcentric Ventures, LLC*, CV 10-1360 SVW PJWX, 2010 WL 4977054
    at *14 (C.D. Cal. July 19, 2010).

- 5 -

1    Judge Wilson found that "no triable issue of fact exists as to whether Defendants engaged

2    in attempted extortion. The communications between Plaintiffs and Defendants do not, as

3    a matter of law, suggest or imply any threat within the meaning of California Penal Code

4    § 519 [California's extortion statute]." *Id.* at *20. Summary judgment was granted for

5    Xcentric on the RICO extortion claim.

6    ## II.    THE CURRENT ACTION

7         On July 18, 2011, Xcentric filed a Complaint in this Court, bringing claims for

8    malicious prosecution and aiding and abetting tortious conduct against AEI, Mobrez,

9    Llaneras, and their attorneys. (Doc. 1.)[4] The AEI Plaintiffs moved for judgment on the

10   pleadings on November 30, 2012. (Doc. 156.) The Court granted that motion in part,

11   dismissing all of Xcentric's claims save those premised on the extortion litigation. (Doc.

12   213.) The AEI Plaintiffs now move for summary judgment.

13                                  **DISCUSSION**

14   ## I.    LEGAL STANDARD

15        Summary judgment is appropriate if the evidence, viewed in the light most

16   favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

17   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

18   P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over

19   facts that might affect the outcome of the suit under the governing law will properly

20   preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

21   248 (1986). In addition, the dispute must be genuine, that is, the evidence must be "such

22   that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Villiarimo v.*

23   *Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Thus, the nonmoving party

24   must show that the genuine factual issues "'can be resolved only by a finder of fact

25   because they may reasonably be resolved in favor of either party.'" *Cal. Architectural*

26   _____

27        [4] Default judgment has been entered against one attorney and AEI. (Doc. 126.)
     The Court dismissed Xcentric's case against the other attorney under Rule 12(b)(6).
28   (Doc. 146.)

*Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); see also L.R.Civ. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[ ] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

## II.    ANALYSIS

### A.    Malicious Prosecution

Under California law, "[m]alicious prosecution is a disfavored action. . . . This is due to the principles that favor open access to the courts for the redress of grievances." *Downey Venture v. LMI Ins. Co.*, 78 Cal. Rptr. 2d 142, 150 (Ct. App. 1998). California

1    law requires the narrow construction of a malicious prosecution claim to ensure that

2    "litigants with potentially valid claims will not be deterred from bringing their claims to

3    court by the prospect of a subsequent malicious prosecution claim." *Sheldon Appel Co. v.*

4    *Albert & Oliker*, 765 P.2d 498, 502 (Cal. 1989).

5         Three elements must be established to show malicious prosecution: "a plaintiff

6    must demonstrate that the prior action (1) was commenced by or at the direction of the

7    defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought

8    without probable cause; and (3) was initiated with malice." *Id.* at 501 (internal quotations

9    omitted). The AEI Plaintiffs assert that Xcentric has failed to produce sufficient evidence

10   to justify trial on any of those elements.[5] Because the Court finds that the extortion claim

11   did not lack probable cause on the basis of the undisputed facts, summary judgment is

12   appropriate and the remaining claim is dismissed.

13        "A litigant will lack probable cause for his action either [1] if he relies upon facts

14   which he has no reasonable cause to believe to be true, or [2] if he seeks recovery upon a

15   legal theory which is untenable under the facts known to him." *Sangster v. Paetkau*, 80

16   Cal. Rptr. 2d 66, 75 (Cal. Ct. App. 1998). Xcentric's chief claim throughout this lawsuit,

17   the claim that survived the AEI Plaintiffs' Motion for Judgment on the Pleadings, is that

18   the AEI Plaintiffs lied about their conversations with Magedson to fabricate evidence for

19   a baseless extortion claim. The Court has previously ruled that the legal theory behind the

20   AEI Plaintiffs claim, assuming the truth of the facts they alleged, was not "so absurd that

21   no reasonable attorney would have advanced it." (Doc. 146 at 11–13.) That foreclosed

22   any argument that the AEI Plaintiffs' extortion *theory* lacked probable cause.

23   Nevertheless, the Court found that Xcentric sufficiently pled a lack of probable cause

24   because its allegations of falsification could show the AEI Plaintiffs "relie[d] upon facts

25

26        [5] The AEI Plaintiffs devote most of their Motion and Statement of Facts to an
     attempt to relitigate their claims in the California Action. This includes claims about
27   Xcentric's supposed immunity under the Communications Decency Act or provision of a
     separate arbitration program. None of those matters are relevant to the narrow issue
28   remaining in this suit.

which [they] ha[d] no reasonable cause to believe to be true." (Doc. 213.) Xcentric thus argues that the AEI Plaintiffs' alleged lies formed the backbone of their extortion claim. The AEI Plaintiffs now claim that there is insufficient evidence to show that the extortion claimed lacked probable cause because their extortion claim did not rise or fall with their supposedly false claims regarding Magedson's communications. In making this argument, they also relied on separate email communications and the structure of the CAP itself.

The burden to show a lack of probable cause is high because California law gives a malicious prosecution defendant the benefit of the doubt: "[i]n making its determination whether the prior action was legally tenable, the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant." *Sangster*, 80 Cal. Rptr. 2d at 75. All the defendant needs is some rational basis for the claim pursued. Accordingly, the defendants' lack of success in the underlying action is hardly an automatic basis for a malicious prosecution suit. *Paiva*, 85 Cal. Rptr. 3d at 849. Indeed, "[p]robable cause may be present even where a suit [proves] merit[less]." *Jarrow Formulas, Inc. v. LaMarche*, 74 P.3d 737, 743 n.13 (Cal. 2003) (internal quotations omitted).

The probable cause standard is objective and considers the "facts upon which the defendant acted in prosecuting the prior case." *Paiva v. Nichols*, 85 Cal. Rptr. 3d 838, 848 (Cal. Ct. App. 2008) (citing *Sheldon Appel*, 765 P.2d at 511–12). Whether probable cause existed on those facts is a question of law for the court to decide, often at the summary judgment stage. *Id.*; *Sheldon Appel*, 765 P.2d at 503–07. Nevertheless, "if the facts upon which the defendant acted in bringing the prior action are controverted, they must be passed upon by the jury before the court can determine the issue of probable cause." *Sheldon Appel*, 765 P.2d at 506. That means "[w]hat facts and circumstances amount to probable cause is a pure question of law. Whether they exist or not in any particular case is a pure question of fact. The former is exclusively for the court, the latter for the jury." *Id.* As with all issues on summary judgment, though, "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. So long as the core facts are undisputed, the Court may proceed to determine whether probable cause was present on the basis of those facts. *Sangster*, 80 Cal. Rptr. 2d at 76.

According to the California Complaint, the CAP was extortionate. (Doc. 55, Ex. A ¶ 62.) It promised, for a fee and with an admission of wrongdoing, "to 'change[ ] the negative listings on search engines into a positive along with all the Reports on Rip-off Report.'" (*Id.*) The AEI Plaintiffs thought this claim implied that "Defendants would correct the content of the defamatory posts", (*id.* ¶ 34), although Xcentric maintains that it does not remove posts. When asked by the California District Court to provide declarations about conversations where this extortion occurred, Mobrez cited email and telephone conversations with Magedson where they allegedly discussed the contours of the CAP and Magedson stated that membership would cost "at least 'five grand' plus a monthly maintenance fee of a couple hundred dollars." (*Id.*, Ex. C ¶¶ 11-13.) Repeating the claim made in the Complaint, Mobrez asserted that Magedson described the benefits of the CAP as "'all the negative goes away and you see the positive.'" (*Id.* ¶ 14.)

Xcentric's argument that the extortion claim lacked probable cause centers on the AEI Plaintiffs' claim in the California Complaint and later declarations about their conversations with Magedson. There is substantial evidence those statements were false. Magedson vehemently denies the substance of those conversations as contained in the declarations filed by Mobrez and Llaneras. (Doc. 199-2 (Magedson Decl. 1) ¶ 5.) He claims that audio recordings directly contradict the AEI Plaintiffs' claims that Magedson told them that CAP membership would cost around $5,000, plus a monthly rate. (*Id.* ¶¶ 6–19.)[6] Even without direct evidence of that contradiction, the wholesale changes in the "corrected" declarations evidence that the AEI Plaintiffs were not speaking truthfully in

---

[6] Neither party has sought to provide transcripts of those recordings or otherwise use them for purposes of this Motion. The Court therefore abstains from ruling on their admissibility.

1   their initial submissions. Both Mobrez and Llaneras admitted that their statements "were
2   not accurate." (Doc. 55, Exs. F, G.) Llaneras had averred that she made contemporaneous
3   handwritten notes of the conversation that purport to show Magedson demanded $5,000
4   to join the CAP, but she later admitted that those notes were not created
5   contemporaneously. (*Id.*, Ex. G; Doc. 181-1, Ex. C.) Finally, the AEI Plaintiffs have
6   never claimed in this litigation that their statements in the original declarations were true.
7   While they maintain that "someone" from Xcentric contacted them and told them that
8   CAP membership would cost "five grand", they have submitted no evidence to that
9   effect.[7] Still, the AEI Plaintiffs contest Xcentric's claim that they lied about those
10  conversations; instead, they claim that they confused the telephone conversations with
11  email chains and conversations with others. There is thus a factual dispute surrounding
12  the declarations, their content, and the AEI Plaintiffs' state of mind.

13          But even assuming that the AEI Plaintiffs fabricated or lied about those
14  conversations to support their extortion claim, California law is clear that Xcentric's case
15  fails if there are "*any* undisputed facts objectively establishing, as a matter of law, that
16  any reasonable attorney would have thought the claims . . . were tenable." *Sangster*, 80
17  Cal. Rptr. 2d at 76 (emphasis added). The AEI Plaintiffs assert that the Parties' dispute
18  about the declarations does not affect the core of the extortion claim. Indeed, the
19  documents filed in the California Action show that the extortion claim never relied solely
20  on the telephone conversations between Mobrez and Magedson. The AEI Plaintiffs
21  included all "electronic and telephonic communication between Mobrez and Magedson"
22  as the "several predicate acts sufficient to establish a 'pattern of racketeering activity' . . .
23  ." (Doc. 55, Ex. A ¶ 64.) Throughout the California Action, the AEI Plaintiffs cited
24  telephone and email communications as evidence of that pattern. The California District
25  Court's decision analyzed each of those communications. *See AEI*, 2010 WL 4977054 at

---

26
27          [7] The AEI Plaintiffs did file an unsigned declaration purporting to be from a
    "Steven Monk," who claims he was contacted by Xcentric about paying money to get
28  content removed. (Doc. 187, Ex. 11.) Obviously, an unsigned declaration is inadmissible
    evidence and the Court has not considered it.

1  *15–19 ("In sum, none of the communications Defendants sent to Plaintiffs contain any

2  suggestion that the CAP Program (or the payment of fees) would result in negative

3  reports being taken off the website or that such reports would no longer be featured in

4  search results.").

5       While there may be a dispute of fact as to the extent of the AEI Plaintiffs' reliance

6  on the supposedly nonexistent telephone conversations, there is no genuine dispute of

7  material fact that those conversations were not the sole basis of the case. The AEI

8  Plaintiffs advanced other conversations to show a pattern of racketeering activity. (Doc.

9  55, Ex. A ¶¶ 63–64.) Xcentric's single-minded focus on the oral conversations ignores

10 the fact that the AEI Plaintiffs' theory swept more broadly.

11      In fact, the focus of AEI Plaintiffs' extortion claim was the CAP program itself,

12 not specific conversations. Their claim was that "Defendants' *program* amounts to

13 attempted extortion." (Doc. 55, Ex. A ¶ 63.) The oral and written conversations, with

14 their references to the website, provided the predicate acts. It is undisputed that the CAP

15 works in the following way: (1) RipoffReport user posts report that company does not

16 like; (2) company contacts RipoffReport to do something about it; (3) RipoffReport

17 directs the company to the CAP; (4) company pays a fee to enroll in the CAP and

18 acknowledges wrongdoing or makes efforts to restore consumer confidence; (5) and, in

19 return, Ripoff Report will note on the posts that the company is now enrolled in the CAP

20 and is addressing the problems, among other things. Xcentric does not dispute this.

21 Indeed, Magedson has submitted several declarations that describe how the CAP

22 functions. And it is precisely those facts that formed the basis of the extortion claim. That

23 the AEI Plaintiffs may have made false statements about the amount of the fee or where

24 or when they learned about the fee does not alter the fact that there is a fee.

25      In addition, Xcentric advertises that CAP participation results in better publicity

26 for the company—Magedson has admitted that "I frequently explain to people that one of

27 the benefits of joining the CAP program is that they can 'turn a negative into a positive'".

28 (Doc. 199-2, Ex. B ¶ 14.) Those are the same words quoted by the AEI Plaintiffs in their

Complaint and Declarations. While Magedson may not mean that RipoffReport.com will go in and modify the content of the actual post, it is undisputed that Ripoff Report does update the post with information about the company's participation in the CAP and remedial efforts.

The core facts of the AEI Plaintiffs' extortion claim are therefore undisputed because they are the basic aspects of the CAP, and the predicate acts are Magedson's description of the CAP in email and telephone conversations. Xcentric allows users to post content, and then charges for participation in a program that "turns a negative into a positive." And this Court has already determined that an extortion theory that relied on these facts, while tenuous and ultimately meritless, did not lack probable cause. For purposes of clarity, the Court repeats that ruling here:

> Xcentric's FAC alleges that [the AEI Plaintiffs] proceeded on an RICO extortion theory because such a theory would enable the AEI Plaintiffs to avoid the limitations imposed by the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). (Doc. 55 ¶¶ 14–19.) The initial California Complaint supports this claim: the AEI Plaintiffs alleged that conversations between Xcentric and Mobrez demonstrated that Xcentric engaged in extortion. (Doc. 1, Ex. A ¶¶ 57–68.) *See AEI I*, 2010 WL 4977054 at *14.

> Extortion requires that Xcentric threatened "to do an unlawful injury [to the AEI Plaintiffs]; to accuse [the AEI Plaintiffs] of any crime; to expose, or to impute [to the AEI Plaintiffs] any deformity, disgrace or crime; or ... to expose any secret [of the AEI Plaintiffs]." Cal. Penal Code § 519. The first California Complaint alleged that the CAP, in exchange for a fee, promised "to change[ ] the negative listings on search engines into a positive along with all the Reports on Rip-off Report." (Doc. 1, Ex. A ¶ 62.) The AEI Plaintiffs . . . thus argued that the presentation of the CAP program, along with its fees, amounted to a form of extortion. Moreover, although Mobrez had corrected his declaration, he maintained that someone from Xcentric had told him it would cost "five grand" to join the CAP. (Doc. 1, Ex. F ¶ 5.)

> In *Hy Cite Corp. v. badbusinessbureau.com*, a decision of this Court denied a motion to dismiss an extortion claim that had a similar foundation. 418 F. Supp. 2d 1142, 1149–50 (D. Ariz. 2005) ("Here, Defendants operate a website. Plaintiff alleges that Defendants create and solicit false and defamatory complaints against businesses, but will cease this conduct for a

1

2

3

4

5

6

7

8

$50,000 fee and $1,500 monthly retainer. Remedying the publication of false and defamatory complaints, which Defendants allegedly created and solicited, does not give Defendants the right to collect fees."). Nevertheless, the California District Court eventually rejected all of [the AEI Plaintiffs'] theories for lack of evidence. See *AEI I*, 2010 WL 4977054 at *16–19 ("[N]one of the communications Defendants sent to Plaintiffs contain any suggestion that the CAP Program (or the payment of fees) would result in negative reports being taken off the website or that such reports would no longer be featured in search results. The offer to help Plaintiffs restore their reputation and facilitate resolution with the complainants in exchange for a fee does not constitute a threat under California Penal Code § 519.").

9

10

11

12

13

14

15

16

17

18

19

Based on the allegations in Xcentric's FAC and the documents of which the Court has taken judicial notice, the Court cannot say that [the AEI Plaintiffs'] legal theory was so absurd that no reasonable attorney would have advanced it. The *Hy Cite* court found the theory at least tenable on a motion to dismiss, although the California District Court ultimately found the evidence lacking in th[is] case . . . . Moreover, even an absence of legal authority—or presence of contrary decisions—does not amount to a lack of probable cause. *See Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal.App.4th 313, 109 Cal.Rptr.3d 143, 182 (2010) ("[A] claim is not untenable merely because there is no existing authority that indisputably establishes its legal viability. Indeed, a claim is not necessarily untenable even if the existing authority is directly adverse, provided there is a tenable basis to argue for an extension, modification, or reversal of existing law.") (emphasis in original). As the California Supreme Court has recognized, a "court must properly take into account the evolutionary potential of legal principles." *Sheldon Appel*, 254 Cal.Rptr. 336, 765 P.2d at 511 (emphasis in original).

20

21

22

23

24

25

(Doc. 146 at 11-13.) That ruling was appropriate because "[t]he question whether, on a given set of facts, there was probable cause to institute an action requires a sensitive evaluation of legal principles and precedents, a task generally beyond the ken of lay jurors", which means the Court decides whether a given set of facts (here, the CAP and its functions) could support a legal claim (here, extortion). *Sheldon Appel*, 765 P.2d at 504.

26

27

28

In this regard, Xcentric's case is very similar to *Sangster*. There, the malicious prosecution plaintiff alleged that defendants fabricated evidence to support their claims in

the underlying litigation. 80 Cal. Rptr. 2d at 76. Yet that was not enough to get the malicious prosecution claim to a jury. "The principle difficulty with [plaintiff's] argument is that it does not address the question before us: that is, whether there are any *undisputed* facts objectively establishing, as a matter of law, that any reasonable attorney would have thought the claims of [defendants] in the cross-complaint were tenable." *Id.* (emphasis in original). Crucially, "the fact there may be *some* disputed facts relevant to the merits of the underlying action does not by itself defeat a motion for summary judgment in a malicious prosecution action. If undisputed facts in the record do establish an objectively reasonable basis for bringing the underlying action, the existence of other, allegedly disputed facts is immaterial." *Id.* (emphasis in original). There, the Court found that "undisputed evidence . . . upon which all . . . causes of action . . . were expressly based . . . independently established the existence of probable cause to initiate the cross-complaint." *Id.*

So too here. There is evidence that the AEI Plaintiffs made false statements to support their extortion claim. Normally, the murky facts surrounding the declarations would go to the jury. Yet the extortion claim could survive on the undisputed facts of the AEI Plaintiffs' case—namely, how the CAP functions. The allegedly false statements were not the skeleton of the extortion claim—they only provided some of the factual detail. The AEI Plaintiffs relied on other statements—in phone calls or emails directing the AEI Plaintiffs to the CAP website—as evidence of predicate acts of extortion. *See AEI*, 2010 WL 4977054 at *14. Moreover, the actual amount of the CAP fee (the principle dispute in the declarations) was not essential to the extortion claim—just the existence of a fee, which is undisputed. As *Sangster* instructs, there is no claim for malicious prosecution where this is "undisputed evidence . . . upon which all . . . causes of action . . . were expressly based . . . [that] independently established the existence of probable cause to initiate the [underlying claim]." 80 Cal. Rptr. 2d at 76. The AEI Plaintiffs may have made false statements—even lied—about some of the facts. But their case did not depend on those statements. Their lawsuit challenged the CAP and how it

functioned. About that there is no genuine dispute of material fact. Because the Court has previously concluded that an extortion claim based on the general functionality of the CAP did not lack probable cause, it determines that the AEI Plaintiffs' extortion claim did not lack probable cause as a factual or legal matter.

Once a court concludes that probable cause was not lacking, "the malicious prosecution action fails, whether or not there is evidence that the prior suit was maliciously motivated." *Sheldon Appel*, 765 P.2d at 504. Summary judgment for the AEI Plaintiffs is therefore appropriate on the malicious prosecution claim.

### B.    Aiding and Abetting

The AEI Plaintiffs have also moved for summary judgment on the aiding and abetting claim. Xcentric has never addressed the aiding and abetting claim separate from the claim for malicious prosecution, and did not address the AEI Plaintiffs' argument in its Response. The same facts appear to support each claim, and Xcentric has never argued otherwise. There is no evidence cited by the Parties that would support a separate aiding and abetting claim. Summary judgment on that claim is therefore appropriate as well.

### CONCLUSION

The AEI Plaintiffs' extortion claim did not lack probable cause. While there are disputes regarding certain statements the AEI Plaintiffs offered to support their claim, there are undisputed facts upon which they could maintain a claim for extortion. Xcentric has not put forth any evidence to support its claim for aiding and abetting. California law requires judgment for Defendants in such a case.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 184) is **GRANTED**. The Clerk of Court is directed to terminate this action and enter judgment in favor of Defendants Mobrez and Llaneras. Plaintiff shall take nothing.

/ / /

/ / /

/ / /

1      **IT IS FURTHER ORDERED** that Plaintiff's Motion for Reconsideration (Doc.

2   217) is **denied as moot**.

3      Dated this 17th day of June, 2013.

_A. Murray Snow_

G. Murray Snow

United States District Judge